AMERICAN HOIST & DERRICK COMPANY and T. S. DeCuir, Plaintiffs,

v.

The MANITOWOC COMPANY, INC., Defendant.

No. 72–C–474.

United States District Court,
E. D. Wisconsin.

Feb. 27, 1978.

See also 425 F.Supp. 640.

Andrus, Sceales, Starke & Sawall by Glenn O. Starke, Milwaukee Wis., for plaintiffs; William A. Braddock, Robert W. Gutenkauf, Burd, Braddock & Bartz, Minneapolis, Minn., of counsel.

Leydig, Voit, Osann, Mayer & Holt by Philip H. Mayer, Chicago, Ill., for defendant; Davis, Kuelthau, Vergeront, Stover & Leichtfuss by Walter S. Davis, Milwaukee, Wis., of counsel.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

### I. INTRODUCTION

This is an action for patent infringement under 35 U.S.C. § 271 et seq. by American Hoist & Derrick Company (American Hoist) and T. S. DeCuir against the Manitowoc Company, Inc. (Manitowoc). The case was tried to the court, and the parties have filed briefs on the merits and proposed findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

The plaintiff and defendant are competitors in the manufacture and sale of cranes

adapted for lifting heavy loads beyond the capability of conventional cranes of comparable size. American Hoist's heavy lift crane is made and sold under the tradename "Sky Horse"; the defendant's heavy lift crane is made and sold under the tradename "Ringer." The Ringer crane has been made and sold in several models: 4000 Series I, 4100 Series II, 4100 Series III, 4600 Series I, 4600 Series II, and 4600 Series III.

The Sky Horse crane is the commercial adaptation of United States patent no. 3,842,984 (the Sky Horse patent). The Sky Horse patent was issued on October 22, 1974, to American Hoist as the assignee of Archer W. Brown and James L. Montgomery. The Sky Horse patent is an improvement of the counterbalancing crane taught by claims 12 through 14 of United States patent no. 3,202,299 (the DeCuir patent). The DeCuir patent was issued on August 24, 1965, to T. S. DeCuir, as the assignee of Mitchell DeCuir. The Ringer cranes are the commercial adaptation of United States patent no. 3,485,383 (the Ringer patent). The Ringer patent was issued on December 23, 1969, to Manitowoc as the assignee of Daniel E. Beduhn.

The plaintiffs claim that the defendant's manufacture and sale of the Ringer crane models 4100 Series II, 4100 Series III, 4600 Series II, and 4600 Series III infringe claims 12, 13 and 14 of the DeCuir patent and claims 1 and 2 of the Sky Horse patent. Ringer crane models 4000 Series I and 4600 Series I are not accused of infringement. The defendant has counterclaimed, alleging that American Hoist's manufacture and sale of the Sky Horse crane infringe claim 1 of the Ringer patent. For the reasons set forth below, I have determined that the DeCuir patent is not infringed by the defendant's Ringer cranes and that the Ringer patent is not infringed by the plaintiff American Hoist's cranes.

The DeCuir counterbalancing crane was conceived by Mitchell DeCuir, T. S. DeCuir's son, in 1959. The patent application was filed on July 22, 1963, was assigned to T. S. DeCuir in February, 1964, and the patent was issued on August 24, 1965. The patent covered a "three-in-one" crane: a machine which could be used as a standard lift crane, a guy derrick (i. e. a tall mast anchored to the ground with guy cables), and a counterbalancing crane. T. S. DeCuir contacted the plaintiff with a view toward marketing the invention but was turned down initially. After an unsuccessful attempt to get a second company interested in the invention, T. S. DeCuir dealt with the defendant. On April 25, 1964, T. S. DeCuir entered into an option agreement with the defendant concerning two patent applications, one being the DeCuir patent in suit. Under the terms of this agreement, T. S. DeCuir granted the defendant an option to obtain an exclusive license under the patent applications and any patents that might issue from them. Pursuant to this agreement, T. S. DeCuir disclosed the construction of the DeCuir counterbalancing crane configuration to the defendant and submitted drawings and other data, and a model of the counterbalancing crane. T. S. DeCuir had also submitted a copy of the pending patent application to the defendant. In accordance with the terms of the option agreement, the defendant at its own expense filed patent applications in six foreign countries based on the United States patent application.

As drafted, the option agreement included a confidential disclosure provision which required the defendant to hold in confidence all of the materials disclosed by T. S. DeCuir. At the defendant's request, this provision was deleted at the time the agreement was executed.

On July 20, 1964, the defendant notified T. S. DeCuir of its termination of the option agreement. T. S. DeCuir argues that the option agreement was cancelled after the deletion of the nondisclosure provision because no obstacle remained which prevented the defendant's manufacture and sale of a crane in the DeCuir counterbalancing configuration. The plaintiffs assert that dur-

ing the period of the option agreement, the patent application did not specifically cover the counterbalancing crane configuration. However, the plaintiffs point to no evidence which substantiates this assertion, and my review of the testimony reveals none. Also, it appears from the file wrapper of the DeCuir patent that the counterbalancing crane configuration may not have been specifically claimed until a supplemental amendment to the application was filed on February 2, 1965.

The defendant argues that the reason for the deletion of the nondisclosure provision was not that suggested by the plaintiff, but rather was because T. S. DeCuir's disclosures were not submitted on a confidential basis. The defendant claims that the option agreement was cancelled because of engineering problems with the DeCuir guy derrick concept and because of doubts it had with respect to the inventorship of the DeCuir crane. In any case, it is clear that by the time the option agreement was terminated, and well before the Ringer cranes were designed, the defendant was familiar with the DeCuir crane concept through its examination of the patent application, the crane model, and the drawings disclosed by T. S. DeCuir.

The first Ringer crane model was the 4000. It was conceived in late 1965 and 1966, and the first prototype was tested on March 19, 1967. The Ringer model 4600 Series I was developed shortly after the 4000 model. The Ringer patent application was filed on February 9, 1968.

The Sky Horse crane was conceived in late 1967 and the patent application was first filed in October, 1968. According to a memorandum drafted by Archer Brown, one of the Sky Horse inventors, Mr. Brown and James L. Montgomery developed the Sky Horse crane in response to the Ringer cranes, which were exceeding the load handling capacities of American Hoist's cranes. The defendant's counterclaim alleges that the Sky Horse crane infringes the Ringer patent.

The accused Ringer crane models 4100 Series II and III, and 4600 Series II and III were developed subsequent to the appearance of the Sky Horse crane on the market. The plaintiffs claim that these later Ringer models adapted certain features of the Sky Horse crane, discussed in detail below, in such a manner as to infringe the Sky Horse patent.

The Sky Horse patent application was refiled in 1970 and was refiled a second time in December, 1972, after this action was commenced. When the patent issued on October 22, 1974, the plaintiffs filed a supplemental complaint alleging infringement of the Sky Horse patent in addition to the DeCuir patent.

## II. CONVENTIONAL CRANES

The machines involved in this action are heavy lift cranes. A brief comment about the prior art conventional lift crane will facilitate the description of the patents and machines in suit.

Conventional lift cranes generally include the following: a lower works, normally with crawlers or wheels making the crane mobile; an upper works or deck carrying the crane driving and operating machinery; a load handling boom pivoted on the front of the deck for up-and-down angular movement; a counterweight mounted on the rear of the deck; and rigging interconnecting the boom and the counterweight so that a load on the end of the boom is balanced by the counterweight without tipping the crane over. It is also conventional to vary the angle at which the rigging engages the boom by anchoring the rigging at the upper end of a structure carried on the deck.

The parties have engaged in a semantic dispute over the proper term for this structure: The plaintiffs assert that it may properly be called an A-frame or gantry. The defendant urges that it may also properly be referred to as a "mast." The significance of that dispute is that the DeCuir patent describes a mast which is used in

addition to the standard structure, whether it be termed mast, gantry or A-frame. The defendant seeks to establish that this additional mast is not unique.

Although I am convinced from the testimony that the terms may be used interchangeably, I also believe that the additional mast structure on the DeCuir crane is indeed unique and a part of the invention as explained more fully below. For the sake of convenience, however, the term "mast" will be used in this decision to refer only to the longer mast of the plaintiffs' and defendant's cranes. The lower structure to which the rigging is anchored will be referred to as the A-frame or gantry.

Ordinarily, cranes embody machinery for controlling a variety of movements. The deck can revolve (i. e. swing) on the lower works, the boom can be pivoted up and down (i. e., raised or lowered), the lower works can move (i. e., transport) the entire crane, and the mast or gantry can be swung vertically (i. e., raised or lowered). It is also conventional to make cranes of various sizes, to equip a given crane with booms of different lengths, and to vary a crane's rigging by altering the length or position of the gantry.

Cranes have "rated load capacities." This refers to the maximum load that should be handled on a given boom at a given angle. Exceeding this maximum load capacity either will cause the crane to tip over or will cause structural failure of some portion of the machine.

Various methods have been used to increase the lifting capacities of cranes. An increase in the overall size and weight of a crane is one such method, but this method places limitations on crane maneuverability and may require lengthy periods of disassembly and reassembly for transportation.

Another common method is to add a counterweight element to the rear of the crane. The counterweight method employs the teeter-totter principle of balancing the load on one side of the fulcrum point with a weight on the opposite side. There are limitations on the utility of this method also. The added load which can be handled because of the additional counterweight produces an increased compression stress on the boom. The mounting of the counterweight on the rear of the crane also increases the stress on the crane deck and on the turntable (the mechanism that permits the crane deck or upper works to rotate relative to the carrier or lower works.) In addition, too great an increase in the counterweight can cause the machine to overturn backwards when little or no load is carried by the boom.

### III. THE DeCUIR COUNTERBALANCING CRANE

The DeCuir patent is entitled "Mobile Guy Derrick and Counter Balancing Crane." It covers a crane which can be operated in three ways: (1) as a conventional lifting crane; (2) as a guy derrick; and (3) as a counterbalancing crane. The latter two modes of operation are accomplished by fitting the conventional crane with certain attachments. Only the counterbalancing crane concept, described in claims 12 through 14 of the DeCuir patent, is claimed to be infringed by the defendant's cranes.

Because the language of claim 12 is pertinent to much of the following discussion, the entire claim is set forth below:

"A crane comprising:

a platform mounted for horizontal rotation on mobile support means,

a mast pivotally mounted on said platform for rotation with said platform and for pivotal movement through a first vertical arc extending on both sides of a point located perpendicular to the center of rotation of said platform,

power means mounted on said platform for pivotally moving said mast through said first arc,

means for supporting a load on said mast as a counter balance during operation as a counter balancing crane,

a boom pivotally mounted adjacent the lower end of said mast for rotation with said platform and said mast and for pivotal movement through a second vertical arc,

means connected to said mast for moving said boom through said second arc independent of the movement of said mast through said first arc, and

means connected to said boom for supporting a load thereon."

Claims 13 and 14 incorporate by reference the apparatus described in claim 12 and describe with particularity two components of the crane described in claim 12; a mast and boom stop means to limit the backward movement of the mast and boom beyond a point which would cause the crane to tip over, and a means connected to the boom for supporting a load. The counterbalancing crane described in claims 12 through 14, as illustrated in Figure 1 of the patent, is shown in exhibit A in the appendix to this opinion.

In the counterbalancing configuration of the DeCuir patent, as illustrated in Figure 1, a long mast is mounted on the upper works of the crane deck in addition to the standard gantry or A-frame structure. The long mast can be pivoted towards the rear through a vertical arc intersecting the axis of rotation of the crane deck so that in load lifting position, the mast is at a backward-slanting angle. A boom is pivotally mounted to the crane deck adjacent to the lower end of the mast. The upper ends of the mast and boom are connected by rigging which permits movement of the boom in a vertical arc independently of movement of the mast. An auxiliary counterweight is supported from the upper end of the mast. The mast, due to its backward slant, and the auxiliary counterweight together provide a counterbalancing effect to enable substantially greater loads to be lifted on the boom without danger of tipping the crane. With the auxiliary counterweight raised a short distance off the ground, the counterweight rotates with the crane deck upon horizontal rotation of the crane deck. When no load is being lifted, the auxiliary counterweight can rest on the ground so as to obviate the tendency of the crane to tip over and to avoid imposing stress upon the roller pad or crane deck.

The high mast which extends to the rear of the counterbalancing crane configuration of the DeCuir patent positions the boom suspension lines at an angle which substantially reduces the compression on the boom when a load is lifted on the boom, thereby permitting heavier loads to be lifted within the safe stress levels of the boom.

The pivotal connection of the mast to the crane deck in conjunction with power equipment of the machine enables the mast to be self-erected. This also permits adjustment of the mast in the rear-slanted position to suit the particular conditions. For a particular lift, the mast is set in a given position and remains in that position during the lift.

Pivoting the mast and the boom adjacent to each other on the front of the crane deck serves effectively to nullify the horizontal components of compressive forces acting on the crane deck to reduce the compressive stress that would otherwise be carried by the crane deck.

## IV. THE RINGER CRANES

The Manitowoc Ringer is a conventional crane fitted with a group of attachments making the basic crane a Ringer crane. The attachments include beams that are fixed to the lower works and which in turn are fixed to a circular track or ring surrounding the crane. When the attachments are set up and the crane is ready to lift a load, the ring is rested solidly and horizontally on the ground, with the lower works crawlers lifted clear of the ground so that the assembly is no longer mobile.

A second or auxiliary counterweight is positioned closely adjacent the rear of the crane deck. The auxiliary counterweight has wheels riding on the ring so that its weight does not rest on the deck, and the

auxiliary counterweight is coupled to the crane deck so that it rotates with the deck while riding on the ring. The auxiliary counterweight coupling allows, however, relative vertical movement of the auxiliary counterweight and the deck. The rigging connecting the boom and the normal counterweight on the crane deck is augmented with another set of links or pendants connecting the boom with the auxiliary counterweight.

The crane has both a long mast and an A-frame or gantry. The long mast is mounted to incline to the rear when the crane is in a position to lift loads. At the front of the crane, the boom and the long mast are pivoted on a boom carrier extending out to the ring and having wheels or rollers riding on the ring. The mast and boom pivot is directly above the ring so that loads on those members are directed straight down through the ring and its support into the ground. The boom carrier is pivoted to the crane deck for up and down movement so as to rotate with the deck, but without transferring loads to the deck.

The primary difference between the Ringer crane models 4000, 4100 and 4600 is size, the larger-numbered series having a larger crane and ring and a heavier counterweight. In all Ringers, the boom length can be varied to suit the job. In model 4100 and 4600 Ringers, the mast length can be varied to suit the selected boom length.

The Ringer crane model 4000 is constructed in accordance with Figure 1 of the Ringer patent. The later-developed accused cranes were changed in several significant respects. In both models 4000 and 4600 Series I Ringer cranes, a mast is pivoted with the boom and is held by pendants at a fixed angle to the boom so as to be part of the boom system. The use of the fixed mastboom configuration distinguishes these cranes from the subsequently-developed accused Ringer cranes, since the mast and boom of the latter are pivotally connected for movement through the vertical arc independently of each other. In addition, the mast of the model 4000 and 4600 Series I Ringer cranes, although longer than the conventional gantry which is mounted on the crane deck, is shorter than the mast found on the accused cranes. A further factor which distinguishes these cranes from the accused cranes is that their counterweight does not suspend directly from the mast, as does the counterweight of the accused cranes, but instead suspends from the gantry. Illustrations of the model 4000 Ringer crane and of the accused model 4100 Series III Ringer appear in the appendix to this opinion as exhibits B and C, respectively.

The modifications of the model 4000 and 4600 Series I cranes which are found in the accused cranes all appeared subsequent to the entry on the market of American Hoist's Sky Horse crane and are the reason that the model 4000 and 4600 Series I cranes are not accused of infringement.

Model 4600 Ringers require additional cranes to lift their masts into position. Once positioned, the masts remain fixed except for deflection under load. Model 4100 Ringers can be equipped with a self-erecting option allowing the basic cranes to lift their masts into position, where they remain fixed except for deflection under load. Model 4100 Ringers have been sold with and without the self-erecting option.

## V. THE SKY HORSE CRANE

The Sky Horse patent is directed to a crane configuration which is an improvement upon the basic counterbalancing crane concept shown in the DeCuir patent. The Sky Horse patent covers a commercial adaptation of the counterbalancing crane. The Sky Horse crane, as illustrated in Figure 1 of the Sky Horse patent, appears in the appendix to this decision as exhibit D.

The crane construction shown in the Sky Horse patent includes a boom pivotally connected to the front of the crane deck, a standard gantry, a mast pivotally mounted adjacent the boom, and a linkage connecting the top of the mast to the top of the boom. An independent counterbalancing

trailer assembly is connected to and, under load, is carried by the upper end of the mast. The trailer assembly includes a counterweight trailer with a series of wheels which, under no load conditions, support the trailer on the ground or supporting surface independent of the support of the crane deck. Pivotal arms connect the trailer assembly and the crane deck to permit limited vertical movement of the trailer assembly relative to the crane deck, and cause the trailer assembly to rotate with the crane deck as the crane deck rotates on the lower works or carrier. An adjustable first linkage connects the upper end of the mast and the upper end of the boom, and by reeving the linkage in and out, the boom can be pivoted relative to the mast. A second linkage connects the upper end of the mast and the standard gantry that extends upwardly from the crane deck, and a third linkage connects the upper end of the mast and the counterweight trailer.

By incorporating the counterbalancing Sky Horse attachment to a standard crane, an increase in lifting capacity of at least 100% is achieved over that of the standard crane without the attachment. Through removal of the counterbalancing attachment, the machine is usable as a standard crane for smaller jobs.

The Sky Horse crane has mobility and is capable of moving from site to site as well as moving while carrying a load. It also has an increased booming speed over a standard crane so that the boom is moved up and down at an increased rate. Both the mast and the boom of the Sky Horse crane counterbalancing attachment can be self-erected by equipment present on the crane although for convenience, an auxiliary crane can be used. The plaintiffs have enjoyed considerable commercial success in the sale of the Sky Horse crane and the Sky Horse attachments for existing cranes.

In the Sky Horse crane, the adjustment between the second and third linkages is achieved by providing a difference in tension or a tautness between the two linkages, with the second linkage, which connects the mast and the gantry, having more taut-

ness or tension than the third linkage which connects the upper end of the mast to the crane deck. When a load is lifted by the boom, the difference in tautness between the two linkages causes the linkage connecting the mast and the counterweight trailer to first come into play to pick up substantially all of the weight of the counterbalancing trailer assembly before the second linkage which connects the mast with the gantry on the crane deck becomes taut and acts on the weight of the rear end of the crane deck to counterbalance the load on the boom. The phrase used at trial to describe this action is "1–2 lifting."

The defendant contends that the same 1–2 lifting action is claimed in the Ringer patent and that the Ringer crane model 4000, which preceded the Sky Horse crane and patent, operated with the same 1–2 lifting action.

The plaintiffs strenuously disagree with the contention that the Ringer model 4000 crane operates with the 1–2 lifting action. The plaintiffs' position is premised on the theory that regardless of how the Ringer cranes actually operate, neither the Beduhn patent nor any of the other documents concerning the Ringer cranes refer to the 1–2 lifting action. The plaintiffs' expert testified that from his reading of the pertinent documents, it could not be said that the Ringer crane model 4000 operated with the 1–2 lifting action. However, the plaintiffs' expert acknowledged that he had never actually seen a model 4000 from a distance closer than one-half mile and that he had no personal knowledge of how the model 4000 worked.

In contrast, the defendant's expert witnesses, Daniel Beduhn (the inventor of the Ringer patent), and James Morrow, Sr. (the defendant's chief engineer for research and development), testified on personal knowledge that the Ringer crane model 4000 operated with the 1–2 lifting action.

The plaintiffs have been aware of the defendant's position that the Ringer model 4000 operates with the 1–2 lifting action at least since the defendant's motion for summary judgment in August, 1976, which was

grounded on this very point. Yet, the plaintiffs never sought the opportunity to inspect a Ringer model 4000 crane subsequent to the summary judgment motion. Moreover, the only direct evidence on the question of how the Ringer model 4000 crane operates is the testimony of Messrs. Beduhn and Morrow. I agree with the defendant that on this record, it must be found that the Ringer crane model 4000 operates with the 1–2 lifting action. The remaining question whether the Ringer patent actually claims the 1–2 lifting action concept will be treated below in the discussion concerning the plaintiffs' alleged infringement of the Ringer patent.

## VI. VALIDITY OF THE DeCUIR PATENT

The defendant argues that the counterbalancing crane concept is invalid on the grounds of obviousness. 35 U.S.C. § 103. The defendant urges that the "invention" of the counterbalancing crane concept "was simply the hanging of an extra counterweight on the mast of a crane," and that this was obvious to a person with ordinary skill in the art of crane design at the time of the alleged invention.

The plaintiffs disagree with the defendant's characterization of the counterbalancing crane invention. The plaintiffs assert that the counterbalancing crane

". . . is not merely an adaptation of a counterweight to the rear of a crane, but instead involves a particular arrangement or configuration of the components, including the mast, boom and auxiliary counterweight, to provide a dramatic increase in the lifting capacity without subjecting the components of the crane to any substantial additional stress."

The plaintiffs assert that the defendant's proof at trial on the issue of the validity of the DeCuir patent claims 12 through 14 was vague and failed to overcome the presumption that a regularly issued patent is presumed valid. 35 U.S.C. § 282; *St. Regis Paper Co. v. Bemis Co., Inc.*, 549 F.2d 833, 838 (7th Cir. 1977); *Anderson Company v. Sears, Roebuck and Co.*, 265 F.2d 755, 761 (7th Cir. 1959).

■ Patent validity under 35 U.S.C. § 103 is determined based on the three step analysis set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

"Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

### A. Scope and Content of the Prior Art

In addition to the matter discussed above concerning the conventional crane, the defendant relies on several specific prior art references to support its argument that the DeCuir patent counterbalancing crane concept is invalid for obviousness. The references consist of lifting structures which use counterweights or which are alleged to have a "means for supporting a load on said mast as a counter balance" as described in the DeCuir patent.

The defendant also relies on prior art which allegedly anticipates the DeCuir patent element of "power means . . . for pivotally moving" the mast of the crane through a vertical arc from the front to the rear of the crane deck.

French patent no. 936,754 (the French patent) and an unpatented Manitowoc crane which was modified in 1954 (referred to as the "Liberace" crane) disclose the use of counterweights to increase the stability rating of the lifting structure.

The French patent utilizes a counterweight in a system consisting of 2 cranes mounted back-to-back on a locomotive-type structure. The booms of the 2 cranes are connected with a fixed linkage. The load line hangs from one boom, and the counterweight hangs from the other boom but fixed to a support so that it is not free-swinging and cannot be raised or lowered.

The "Liberace" crane was a standard Manitowoc crane modified in 1954 by Du-

Pont, a Manitowoc customer, for use at a nuclear power plant. The counterweight of the Liberace crane is hung from the back of the crane deck which has been strengthened with a rigid extension.

The 1951 Manitowoc model 4500 crane (not one of the patents in suit) employed a power means for moving the boom and gantry through a vertical arc. When the gantry is moved to the forward position, the crane can be used as a drag line machine. When the gantry is returned to the upright position, the machine becomes a conventional lift crane. The defendant emphasizes, and the plaintiffs do not dispute, that a counterweight could be suspended from the gantry. However, the crane was never set up in that manner, and it would be impractical to do so because an auxiliary counterweight hung from the gantry would fail to clear the crane deck itself.

The Davidson patent no. 2,609,939, a reference considered by the patent office during the prosecution of the DeCuir patent, is entitled "Lowerable A-Frame." It discloses an A-frame or gantry which in a raised position has a large angle of incidence between the boom and boom hoist cable. The purpose of this large angle of incidence is explained in the second paragraph of the Davidson patent as follows:

> "It is desirable to have the A-frame of such height that the angle of incidence of the hoist cable to the boom will be sufficient to avoid high stresses in the hoist cable and boom."

The same paragraph explains that the disadvantage of a high stationary A-frame is that it must be removed in order to pass under bridges and like obstructions when the crane is transported. To alleviate this problem, the Davidson patent teaches a mechanism for quickly and easily lowering the A-frame without disconnection. Although a counterweight could arguably be hung from the lowerable A-frame, there would be a clearance problem similar to that referred to above with regard to the 1951 Manitowoc model 4500 crane.

The defendant also cites a sketch made by one of its employees in 1953. The sketch is captioned "Study of Load Handling Model 3900 Crane" and allegedly shows a counterbalancing crane similar to the DeCuir crane. However, no evidence was introduced to establish that the sketch was ever published or ever became known or used. Therefore, it cannot be considered prior art.

**B. Differences Between the Prior Art and the Claims at Issue**

The prior art references cited by the defendant reveal that counterweights can be used to increase the stability rating of cranes; that a conventional A-frame can be positioned so that the mast slants to the rear; and that power means can be adapted to the A-frame to facilitate changes in position.

The DeCuir counterbalancing crane described in claims 12 through 14 is different in several significant respects from the prior art. The most striking difference is the use of a long mast independent of the conventional A-frame or gantry structure. None of the prior art references embody a structure independent of the A-frame to increase the angle of incidence between the boom and boom hoist line, and thereby reduce compression on the boom.

The counterweight used in the Liberace crane was hung from a rigid gantry mounted on the upper works of the crane. In contrast, the mast of the DeCuir crane, because of its length, moved the counterweight away from the crane deck, thereby reducing stresses on the boom and the turntable (the mechanism which permits the upper works of the crane to rotate relative to the lower works).

Another significant difference between the DeCuir crane and the prior art is the unique configuration of the crane's components and the resultant distribution of compressive forces. Although a certain visual similarity between the DeCuir crane and the French patent is apparent, there was no testimony at trial showing how the lifting structure disclosed in the French patent distributed compressive forces under load.

Since the two booms are not mounted adjacent to each other, I do not believe that the compressive forces would be distributed in the manner taught by the DeCuir patent. The DeCuir patent discloses a boom and mast mounted adjacent to each other on the crane deck so as to use the forces traveling through the boom to nullify the forces traveling through the mast.

The most fundamental difference between the DeCuir patent and the French patent is that the DeCuir crane is a mobile lifting structure. Although the counterweight arrangement of the DeCuir crane is similar to that of the French patent, the DeCuir crane is the first *mobile* lifting structure to suspend a counterweight away from the rear of the machine. Furthermore, the DeCuir crane has the capability for horizontal and vertical rotation. In contrast, the lifting structure disclosed by the French patent is anchored to the counterweight, making it immobile. The fixed linkage connecting the back-to-back booms precludes vertical pivoting of the booms, and there is no mechanism which permits the platform to pivot horizontally. Moreover, the very use of the counterweight as an anchor rather than a counter-*balance* demonstrates that the two patents operate on completely different principles.

The Davidson patent teaches a powered mechanism for raising and lowering a conventional A-frame for transportation purposes. The 1951 Manitowoc model 4500 crane used a powered A-frame to permit the conversion of a conventional lift crane into a drag line machine. Neither machine uses a counterweight and neither machine contains the necessary rigging or other means for hanging a counterweight from the A-frame. Without such rigging, there is no functional means for supporting a counterweight. Moreover, the plaintiffs' expert established that it would be impractical to hang a counterweight from the A-frame of either machine. Thus, both in purpose and practice, the two machines bear little similarity to the DeCuir crane.

## C. Level of Ordinary Skill in the Art of Crane Design

I believe that the level of ordinary skill in the field of crane art at the time the DeCuir crane was conceived was that of a trained mechanical engineer, with specialized skill in the techniques of crane rigging.

## D. Obviousness

■ Having considered the factual inquiries set forth in *Graham*, the legal conclusions as to obviousness may be drawn. *Systematic Tool & Machine Co. v. Walter Kiddie & Co., Inc.*, 555 F.2d 342, 348 (3rd Cir. 1977). In resolving the question of obviousness, it must be determined "whether a hypothetical person having ordinary skill in the art would readily have found the same solution when addressing himself to the same problem." *Gass v. Montgomery Ward & Co.*, 387 F.2d 129, 130 (7th Cir. 1967).

In the crane art, a hypothetical inventor would be presumed to be familiar with the principle that adding a counterweight to a crane will increase the crane's stability rating. The inventor would also be presumed to be familiar with the principle that increasing the angle of incidence between the boom and boom hoist cable reduces the stress on the boom and the tendency of the boom to buckle under a heavy load. Both of these principles are essential to the DeCuir counterbalancing crane. However, in my judgment, a person having ordinary skill in the art and familiar with these principles, addressing the problem of increasing a crane's lift capacity, would not have readily produced the DeCuir counterbalancing crane.

■ The problem addressed by Mitchell DeCuir was the central problem faced by all designers of heavy lift cranes: how to increase the lift capacity of a conventional size mobile crane without risking structural failure of the crane's components and without creating a tipping tendency. However, no crane had previously been developed which embodied the solution taught by the DeCuir patent. The use of a long mast in addition to the standard A-frame, the use

of a free-swinging counterweight independent of the crane deck, and the unique configuration of the mast and boom in conjunction with a mobile crane were not, in my opinion, obvious to persons skilled in the art. I therefore find that the DeCuir counterbalancing crane concept described in claims 12 through 14 of the DeCuir patent is not invalid for obviousness.

## VII. IS THE DeCUIR PATENT INFRINGED?

The parties agree that whether the De-Cuir patent is infringed depends upon resolution of the following factual issues: (1) Do the accused Ringer cranes have mobile support means? (2) Are the mast and boom of the accused cranes pivoted to the platform? (3) Do the accused cranes have power means on the platform for pivoting the mast? (4) Do the accused cranes include mast and boom stop means?

### A. "Mobile Support Means"

Claim 12 of the DeCuir patent describes the first element of the claim as "a platform mounted for horizontal rotation on mobile support means." The plaintiffs stress that the Ringer cranes have a crawler assembly upon which the upper works rides. Thus, it is argued that the Ringer cranes have "mobile support means."

The defendant acknowledges that the crawler mechanism, when used, gives the crane mobility, but emphasizes that when the Ringer crane is set up to lift a load, the crawler assembly is lifted off the ground and the crane is entirely supported by the large encircling ring mounted on blocks. Thus, when the Ringer cranes are in a position to lift loads, they are totally immobile.

I am unable to agree with the plaintiffs' contention that the Ringer cranes contain mobile support means. The crawler assembly found in all of the defendant's cranes is actually functional only before the Ringer attachments are added, i. e. when the cranes are used in the conventional mode. However, when the large encircling ring mounted on blocks is added to the conventional crane, together with the other Ringer attachments, the crane is clearly immobile. Furthermore, since the crawler assembly is lifted off the ground when the Ringer is set up for lifting loads, the crawler assembly is no longer the support means of the crane. Rather, the stationary encircling ring is the support means. I therefore find that the accused Ringer cranes lack the "mobile support means" element of the DeCuir patent.

### B. Mast and Boom Pivoted to the Platform

Claim 12 of the DeCuir patent describes "a mast pivotally mounted on said platform" and "a boom pivotally mounted adjacent the lower end of said mast for rotation with said platform. . . . " The platform referred to is that which is mounted on the "mobile support means" discussed above. On the DeCuir counterbalancing crane, the platform corresponds to the crane deck.

The mast and boom of the accused Ringer cranes are pivoted on a roller carrier which travels on the encircling ring. The roller carrier is pin-connected to the crane deck. There is no dispute that the boom and mast are "pivotally mounted." The question is whether the roller carrier is mounted to a "platform" as described in claim 12 of the DeCuir patent.

If the question were only whether the roller carrier should be viewed as part of the crane deck, I would have little difficulty finding that it should not. The Ringer cranes are designed for increased load capacity by removing the compressive forces from the crane deck area and to direct them through the roller carrier and ring where they are finally resisted by the terrain underneath. This is accomplished by mounting the mast and boom on a structure other than the crane deck. The roller carrier is connected to the crane deck merely to produce horizontal rotation of the boom and mast with the crane deck.

The issue, as I view it, is whether the roller carrier of the accused Ringer cranes constitutes "a platform mounted for hori-

zontal rotation." I find that it is. The roller carrier rides atop the encircling ring, thereby providing horizontal rotation. The mast and boom are pivotally mounted to the roller carrier, which serves as a platform. Therefore, I find that the mast and boom are pivotally mounted on a platform for horizontal rotation, as described in the DeCuir patent.

## C. Power Means on the Platform for Pivoting the Mast

Claim 12 of the DeCuir patent also describes a "power means mounted on said platform for pivotally moving said mast through [a vertical arc]." The plaintiffs assert that there is no dispute that the Ringer crane models 4100 Series II and 4100 Series III have such power means mounted on the crane deck. With regard to the larger Ringer crane models 4600 Series II and 4600 Series III, the plaintiffs contend that such power means exist, even though, as a practical matter, an auxiliary crane is ordinarily used to move the mast from its horizontal position to the rearward slanted position. The plaintiffs point to the power-operated drums on the Ringer cranes' deck and to the gantry structure, and contend that "it would be entirely possible to pivot the mast through the vertical arc" if the necessary rigging were added.

The defendant contends that there is no such power means mounted on the platform of any of the Ringer cranes. With respect to the 4600 Series II and 4600 Series III models, it is claimed that an auxiliary crane is necessary to pivot the mast into position. With respect to the 4100 Series II and 4100 Series III, it is stressed that the self-erection equipment used for raising the mast is disconnected once the mast is raised into position, and thus, there is no longer a "power means" for pivoting the mast.

I find that the Ringer crane models 4100 Series II and 4100 Series III with the self-erecting mast equipment do have the element of power means on the platform for pivoting the mast, as described in the De-Cuir patent, but that the Ringer crane models 4600 Series II and 4600 Series III do not.

The 4100 Series II and III models with the self-erecting equipment clearly have power means designed specifically to raise the mast. The defendant's argument that the power means is disconnected once the mast is in place does not refute this fact.

The plaintiffs' argument that it would be possible to pivot the mast of the 4600 Series II and III models if the necessary rigging were added is similar to one of the defendant's arguments rejected above in connection with its attack on the validity of the DeCuir patent. There it was argued that the standard gantry of prior art cranes provides a means for hanging a counterweight in a fashion identical to the DeCuir crane. I rejected that argument, stating that without the necessary rigging, there could be no functional means for supporting a counterweight. For the same reason, I believe that the Ringer models 4600 Series II and III lack the element of a power means for pivoting the mast through a vertical arc.

To summarize, all of the accused Ringer cranes lack two of the elements described in claim 12 of the DeCuir patent: (1) "mobile support means," and (2) a mast and boom pivotally mounted on the platform. Furthermore, two of the accused Ringer crane models, the 4600 Series II and III, lack power means for pivoting the mast. Accordingly, I find that the accused cranes do not infringe claim 12 of the DeCuir patent. Since claim 13, referring to the "mast and boom stop means," and claim 14, referring to a means connected to the boom for supporting a load, incorporate by reference the apparatus claimed in claim 12, there can be no infringement of those claims either. 35 U.S.C. § 112.

## VIII. DO THE ACCUSED RINGER CRANES INFRINGE CLAIMS 1 AND 2 OF THE SKY HORSE PATENT?

As a preliminary defense to the claim that the defendant has infringed the Sky Horse patent, the defendant asserts that the plaintiff committed fraud on the patent office by failing to disclose the Ringer patent to the first of the two patent examiners

during the prosecution of the Sky Horse patent application. The evidence reveals that the plaintiff believed during the prosecution of the Sky Horse application that the Ringer patent was not pertinent prior art. However, after the application was approved, the plaintiff disclosed the Ringer patent to the patent office. A different examiner than the one who had approved the Sky Horse patent reviewed the Ringer patent and determined that the Sky Horse patent was patentable over that reference, and so informed the plaintiff by a communication dated May 24, 1974.

■ Since the evidence demonstrates that the patent office in fact considered the Ringer patent, I am unable to conclude that fraud has been committed on the patent office. *Feed Service Corp. v. Kent Feeds, Inc.*, 528 F.2d 756 (7th Cir.), cert. denied 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976).

The Sky Horse patent is an improvement on the counterbalancing crane concept described in the DeCuir patent claims 12 through 14. Three basic changes appear in the Sky Horse patent:

(1) The free-swinging counterweight was replaced with a counterweight trailer assembly supported by wheels.

(2) Coupling arms were added to connect the counterweight trailer assembly to the crane deck so as to permit the assembly to rotate with the crane deck around the vertical axis of the crane. The coupling arms were pivotally connected to the crane deck to permit the trailer assembly to lift vertically.

(3) The second linkage was made variable so that the counterweight trailer assembly lifts vertically and acts on the mast before the crane deck begins to assume any counterbalancing load. As explained previously, the shorthand phrase used at the trial to describe this movement is "1–2 lifting."

More significant, however, with respect to the issue of infringement are the aspects of the DeCuir patent that have been retained in the Sky Horse patent. Claim 1 of the Sky Horse patent describes "an upstanding mast and an upstanding boom

both pivotally mounted on a forward portion of the deck. . . ." Claim 2 of the Sky Horse patent describes a "movable car body," thereby retaining the mobile crane concept.

■ In view of my determination that the accused Ringer cranes do not have a mast and boom pivotally mounted to the crane deck, and that they lack mobile support means, the claim that the Sky Horse patent is infringed must fail.

## IX. DOES THE SKY HORSE CRANE INFRINGE CLAIM 1 OF THE RINGER PATENT?

The defendant claims that the plaintiff's Sky Horse cranes infringe claim 1 of the Ringer patent. That claim provides as follows:

1. A load handling assembly comprising:
a central station;
a support having a segment disposed on one side of the central station;
a boom carried by the assembly on the other side of the central station for handling a load at the free end thereof;
means for hoisting a load from the free end of the boom;
a counterweight supportedly engaging the support; and means interconnecting the counterweight and the boom for raising the counterweight off of the support when the boom is loaded by hoisting a load.

The plaintiff asserts, and the defendant agrees, that in order for the Sky Horse to infringe the Ringer patent, the term "support" as used in claim 1 of the Beduhn patent must be construed to cover the ground beneath the crane. The plaintiff argues that the defendant is estopped from construing the term "support" to mean anything other than an auxiliary support such as the encircling ring utilized in the Ringer cranes, and that if construed to mean the ground underneath the crane, the Ringer patent reads on the prior art of the DeCuir and French patents and is therefore invalid.

In my judgment, the evidence warrants the conclusions that the term "support" as

used in claim 1 of the Beduhn patent refers to an auxiliary support rather than the ground underneath the crane and that the defendant is estopped from interpreting the claim to encompass "support" in the asserted manner.

I turn first to the language of the claim itself. The preamble of the claim refers to a "load handling assembly" which comprises, inter alia, "a support having a segment disposed on one side of the central station." I find it difficult to conceive of the ground as being part of an "assembly" or as having a "segment disposed" on one side of a crane.

Secondly, the defendant's patent counsel, on page 36 of the file wrapper, stated: "It may be that the Examiner has interpreted claims 1 and 5 of this application as not requiring the counterweight to be directly supported or supportedly engaged by the auxiliary support. Claims 1 and 5 have been amended to clarify this point."

Throughout the Ringer patent's abstract of disclosure and summary of invention, the auxiliary support clearly refers to the large encircling ring of the Ringer cranes. In addition, claim 2 of the Ringer patent (which is not claimed to be infringed) further defines the support referred to in claim 1 as having:

". . . another segment on the other side of the central station for providing support for the boom, the segments being directly supported on the underlying surface."

If the segments of the support are themselves directly supported by an underlying surface, the support must be something other than the ground. For these reasons, the defendant is estopped from interpreting claim 1 of the Ringer patent in a manner which equates "support having a segment" with the ground beneath the crane. Therefore, the claim that the Sky Horse crane infringes claim 1 of the Ringer patent cannot be sustained.

One of the most sharply disputed factual questions in this case is whether the Ringer model 4000 crane operates with the 1–2 lifting action, i. e. whereby the auxiliary counterweight first comes into play and then the ordinary counterweight on the crane deck begins to assume some of the counterbalancing load. In section V of this decision, I resolved this question in favor of the defendant, finding that the Ringer 4000 does operate with the 1–2 lifting action. However, the conclusion that the Sky Horse crane (which admittedly operates with the 1–2 lifting action) does not infringe claim 1 of the Ringer patent is buttressed by the fact that claim 1 of the Ringer patent does not refer to or describe any such 1–2 lifting action.

The defendant relies on the following language from claim 1 of the Ringer patent to support its assertion that the patent describes a 1–2 lifting action:

". . . means interconnecting the counterweight and the boom for raising the counterweight off of the support when the boom is loaded by hoisting a load."

I find nothing in this language which would suggest to one skilled in the art that the counterweight is raised prior to the counterweight mounted on the central station, and I find nothing in the patent specifications conclusive on the point either.

Title 35 U.S.C. § 112 requires that the patent's specifications "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The purpose for this requirement is to "distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232 (1942), quoted in *Flexwood Co. v. Faussner & Co.*, 145 F.2d 528, 536 (7th Cir. 1944). The failure to so describe the invention precludes its consideration in an action for infringement. *Wilcox Manufacturing Co. v. Eastern Gas & Fuel Associates*, 400 F.2d 960, 963 (4th Cir. 1968), cert. denied 392 U.S. 1051, 89 S.Ct. 691, 21 L.Ed.2d 693 (1969). Because claim 1 of the Ringer patent fails adequately to describe

the 1–2 lifting concept, its consideration is barred.

■ For the above reasons, I find that the plaintiff's manufacture and sale of the Sky Horse crane do not infringe the Ringer patent. In view of this conclusion, I need not reach the plaintiff's argument that the Ringer patent is invalid because it was allegedly on sale more than one year prior to the Ringer patent application.

## X. CONCLUSION

For the reasons expressed in this decision, I conclude that the defendant's manufacture and sale of the accused Ringer cranes do not infringe the DeCuir or Sky Horse patents and that the plaintiff's manufacture and sale of the Sky Horse crane do not infringe the Ringer patent.

Therefore, IT IS ORDERED that the plaintiffs take nothing and that their complaint be and hereby is dismissed.

IT IS ALSO ORDERED that the defendant take nothing and that its counterclaim be and hereby is dismissed.

IT IS FURTHER ORDERED that this action be and hereby is dismissed, without costs to either party.

## APPENDIX

### EXHIBIT A

THE DECUIR COUNTERBALANCING CRANE

**EXHIBIT B**

Manitowoc Model 4000
Ringer Crane

**EXHIBIT C**

Mast

Boom

Standard A-frame
Or Gantry

Auxiliary
Counterweight

Upper
Works

Manitowoc Model 4100 Series III
Ringer Crane

Ring Lower Works

**EXHIBIT D**

The American Hoist
Sky Horse Crane

