FMC CORPORATION, Plaintiff,

v.

The MANITOWOC COMPANY,
INC., Defendant.

The MANITOWOC COMPANY,
INC., Plaintiff,

v.

FMC CORPORATION, Defendant.

Nos. 80 C 4742, 81 C 2422.

United States District Court,
N.D. Illinois, E.D.

Jan. 30, 1987.

Raymond P. Niro, Timothy J. Haller, Niro, Scavone, Haller & Niro, Ltd., Bruce S. Sperling, Paul E. Slater, Sperling, Slater & Spitz, P.C., Chicago, Ill., for FMC.

Phillip H. Mayer, Berton Scott Sheppard, Leydig, Voit & Mayer, Ltd., C. Lee Cook, Richard S. Rhodes, Chadwell & Kayser, Chicago, Ill., for Manitowoc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

WILLIAM T. HART, District Judge.

### I.

### Introduction

FMC Corporation ("FMC") seeks a declaratory judgment of patent invalidity and non-infringement, and damages for violation of antitrust laws and for common law unfair competition. The Manitowoc Company, Inc. ("Manitowoc") claims damages for patent infringement. Jurisdiction exists under 28 U.S.C. § 1338(a), 28 U.S.C. §§ 1332 and 1338(b), 15 U.S.C. § 15 and 28 U.S.C. § 1337.

Manitowoc owns United States Patent No. 3,485,383 ("'383 patent"), entitled "Auxiliary Support For Cranes," which issued in the name of Daniel E. Beduhn on December 23, 1969. The patent expired December 23, 1986. The application was filed on February 9, 1968. FMC contends that the '383 patent was invalid and not infringed. Claims for declaratory relief with respect to two other Manitowoc patents (U.S. Patents Nos. 2,878,944 and 3,949,881) were dismissed on the basis of Manitowoc's representation that FMC did not infringe either of the patents, and hence, no justiciable controversy existed.

FMC alleges that by enforcing an invalid patent Manitowoc prevented it from early entry into the heavy lift crane market. It contends that Manitowoc fraudulently withheld important information from the Patent Office during the procurement of the '383 patent that would have prevented the patent's issuance, and further that Manitowoc has maintained and enforced the '383 patent with knowledge of its invalidity. FMC claims that Manitowoc unlawfully restrained trade and commerce in, attempted to monopolize and monopolized, the market for heavy lift cranes that employ or are compatible with the ring and lift attachment covered by the '383 patent.

Manitowoc has previously asserted the '383 patent in litigation with American Hoist & Derrick Company. *American Hoist & Derrick Company v. The Manitowoc Company*, 448 F.Supp. 1372 (E.D. Wisc.1978), *aff'd*, 603 F.2d 629 (7th Cir. 1979). In that litigation, an accused American Hoist crane was found not to infringe claim 1 of the Manitowoc '383 patent. No decision was reached on the validity or

enforceability of the patent or specifically with respect to claims 5 and 6 which Manitowoc says were infringed by FMC.[1] Fraud and on sale issues were also tried but not decided. Much evidence discovered initially in the *American Hoist* case has been offered in this case.

The products at issue in the litigation are FMC's LS–718 and LS–918 cranes and heavy lift attachments (LS–718HLA and 918HLA), which have been charged with infringement of the '383 patent. The Manitowoc 4000W, 4100 and 4600 cranes and ring attachments are covered by the '383 patent.

The inventor, Daniel E. Beduhn, died before trial. Beduhn's deposition testimony is part of the record.

## II.

### FINDINGS OF FACT

#### (1) Heavy Lift Cable Crawler Cranes

A cable crawler crane of the type described in the '383 patent includes a lower works with crawlers to move the crane on the ground and an upper works that rotates on the lower works. The upper works includes a house enclosing the engine, cable storage drums, winches and operating controls, a load handling boom capable of up-down and angular movement from which the load is suspended, a mast and rigging (sometimes called the gantry) interconnecting the boom and the balancing counterweight on the rear of the upper works. All of the crane structure behind the fulcrum point, at which the crane would tip over, also supplies counterbalancing counterweight. The lower works includes the crawlers and wheels making the crane mobile. A crawler crane can pick up a load and move it before placing the load. The crane's tipping fulcrum point is that point just beneath the machine structure closest to the load that is touching the ground.

A crane is said to pick or lift a load. Swing is rotating movement of the crane upper works on the lower works about a vertical axis. A turntable interconnects the upper and lower works. A crane's working radius is measured by how far the lifted load is horizontally spaced from the vertical axis of the turntable.

Crane design deals with problems of stability and strength. A crane is rated in terms of how much it can lift at a given radius. The shorter the radius, the heavier the load capability. Load times radius equals an overturning moment that must be balanced by a counterweight moment in order to provide stability. At certain radii—the extremes of closest and furthest out—the capacity of a crane is limited by the strength of certain members or components. Load ratings are set so as to insure that loads remain less than that which would cause tipping or structural damage. At middle radii, the capacity of a crane is stability limited. Its rating is determined so that a load will not cause the crane to start tipping over.

The stability limit of a crawler crane is usually rated as 75% of the load moment that causes the rear of the crane—that portion furthest from the load—to begin lifting. Truck mounted cranes ordinarily have mechanical extensions ("outriggers") to provide extended or substitute fulcrum points. Such cranes are regarded as having lift capacity of 85% of tipping load. This standard was also used to determine the load capacity of the '383 patent attachment.

Cranes have "rated load capacities" that are determined both by calculation and experimentation. Load capacities are stated as maximum loads that can be handled on a given boom and a given angle. Stability and strength design problems become more complex as the size and weight of loads being moved increases.

Various methods have been used to increase the lifting capacity of cranes. An increase in the overall size and weight of a

---

**1.** In the pretrial order presented to the court in October of 1985, and at trial, Manitowoc limited its claims of infringement to claims 5 and 6 as applied to FMC's LS–718HLA crane.

crane is one such method, but this method places limitations on crane maneuverability and may require lengthy periods of disassembly for transportation.

Another method is to add counterweight at the rear of the crane employing the teeter-totter principle of balancing a heavier load on one side of the fulcrum point with an additional weight on the opposite side. This method has its limitations also. The additional counterweight can produce increased compression and tension. The mounting of counterweight on the rear of the crane also increases forces on the crane deck or turntable mechanism that permits the upper works to rotate on the lower works. Also, too great an increase in the counterweight can cause the machine to tip backwards when little or no load is carried by the boom. The patent in suit overcomes these problems.

### (2) The '383 Patent

The '383 patent discloses a load handling assembly utilizing a modified Manitowoc 4000 crane with a ring support system. The trade name of the attachment is "The Ringer." The use of the system allows the lifting capacity of a given size of crane to be increased from two to four times. A crane having a normal rating of 150 tons modified in accordance with the invention of the patent can lift loads of 300 tons. (Later models are capable of increased tons of lift capacity.) When the crane is loaded the movable auxiliary counterweight is raised off of the annular support in a way that acts to offset a portion of the load being hoisted. The support ring can be secured to the crane and the crane rigging can be adapted without major structural changes to the crane.

The lift attachment design is shown in figures of the '383 patent which are attached to this opinion as Appendix No. 1. (The patent elements are referred to in this opinion by the parenthetical numbers that appear in the patent figures and specifications.)

The load handling assembly consists of a basic cable 4000W crawler lift crane in combination with a surrounding support ring (16, Figure 2) that carries an auxiliary counterweight (122). The auxiliary counterweight is directly supported through rollers on the circular support ring. The rollers (126) permit the auxiliary counterweight to rotate by moving across the upper surface of the ring. The auxiliary counterweight is positioned on the ring adjacent to a main counterweight (50) that is carried on the rear of the crawler crane. The auxiliary counterweight is vertically and horizontally slidable relative to the main crane counterweight (Figure 4), the latter being entirely supported by the basic crawler crane. A boom (14) and mast (70) are supported at a common point on the support ring in front of the crane pivot point (42) at a point diametrically opposite from the auxiliary counterweight and main counterweight. The boom and mast are connected to the upper rotating portion of the crane through an intermediate carrier (40). The effect of supporting the boom on the ring is to extend the fulcrum. The axis of tipping is disposed further forward and the center of gravity of the system opposed to the load (including the main counterweight, auxiliary counterweight, and body of the crane) is further from the tipping axis. The auxiliary counterweight is supported independently of the main counterweight, can travel over the center of the support ring surface and lift off (Figure 3) of the support ring when a load of sufficient weight is hoisted. The weight that is lifted on one side of the pivot point where the boom and mast are connected is balanced by the counterweight on the other side of the pivot point.

The ring is connected (Figure 5) to the lower works (18) of the crane. The ring (16) comprises a frame member (112) on each side of the lower works (18) which extends generally in the direction of travel of the crane (Figures 2 and 5). Disposed on the frame member (106) are jack assemblies (120) which are used to support and level the entire system prior to the positioning of wooden blocks (104), as shown in Figures 1, 2 and 3.

A gantry system is provided which interconnects the counterweight and the boom so that the auxiliary counterweight is raised from the ring when the boom is loaded. This operation acts to offset a portion of the load being hoisted. Links (78 and 82) are connected together by a pin connection (86) in a triangular gantry structure which is not entirely rigid (76).

Rotation of the mast (70) tends to move the pin connection (86) of the gantry assembly (76) in the direction shown by the arrow in Figure 3. Because of the deflection induced in the gantry assembly and the upper works (12) by the application of load (144), the upper end portion of the link (128) is raised thereby lifting the counterweight means (122) off of the auxiliary support (16) as shown in Figure 3. That portion of the load offset or balanced by the auxiliary counterweight means (122) on the assembly (10) is not imposed on the upper works or the lower works of the crane.

Claims 5 and 6, relied upon by Manitowoc as a basis for infringement of the '383 patent by FMC are as follows:

5. load hoisting assembly comprising: a lower works;

an upper works rotatably mounted on the lower works;

a support having at least a first portion horizontally positioned on one side of the upper and lower works and a second portion horizontally positioned on the other side thereof, the portions being directly supported on the underlying surface;

counterweight means directly supported by the first portion for movement thereon as the upper works rotates with respect to the lower works;

means cooperating between the counterweight means and the upper works to enable the counterweight means to rotate with the upper works;

a carrier connected at one end to the upper works and supported at the other end by the support for movement thereon;

boom means connected to the carrier;

means for hoisting a load from the free end of the boom means; and

means interconnecting the counterweight means and the boom means for raising the counterweight means off the support when the boom means is loaded.

6. The load hoisting assembly of Claim 5 wherein the support describes an annular generally circular path;

the counterweight means comprises rollers on the path; and

the carrier comprises rollers on the path.

The trial court in *American Hoist* found that the '383 patent was based on sequential loading (or 1–2 lifting action [2]).

### (3) Development of the Ringer Attachment

In the mid–1960's Manitowoc was engaged in the manufacture and sale of crawler lift cranes and was attempting to concentrate on the relatively large lift crane business. Manitowoc's Model 4000 crane (150 ton nominal capacity) was the largest lift crane then manufactured by Manitowoc. The industry trend at the time was to larger crane capacities.

In 1964, John West, Manitowoc's President, traveled to Munich, Germany and attended a trade fair at which he saw a crane design that included a ring support around a truck crane which had the effect of increasing the crane's capacity. West recalled returning to Manitowoc with materials illustrating that approach. West obtained a two page M.A.N. brochure which is referred to on page 46 of the file wrapper of the '383 patent.

---

**2.** The phrase "1–2 lifting action" is not found in the patent. It is terminology suggested by the parties in *American Hoist* to describe the sequence of load on the boom first engaging the auxiliary counterweight, which then lifts off the support ring before the main body of the crane reacts to the load on the end of the boom.

#### (4) FMC's Entry into the Heavy Lift Market

In 1967, FMC entered the material handling and construction fields with the acquisition of Link-Belt Company. FMC, through the Link-Belt Company, introduced its LS–518 crane (150 nominal ton capacity) which was in competition with Manitowoc's 4000 Model crane.

After the issuance of Manitowoc's '383 patent, FMC engaged in a $2.7 million design effort to avoid infringement of the Manitowoc '383 patent. FMC analyzed the '383 patent as being valid and enforceable. FMC's surveys showed that Manitowoc's Ringer was the heavy lift preference of users, prospective customers and dealers.

In the late 1960's and throughout the 1970's, the market for heavy lift crane equipment was strong. The market was affected by the construction of electric power plants, oil drilling, oil refining, and building construction which required heavy lift crane equipment. By 1982, the market for heavy lift crane equipment began to dissipate due to a reduction in power plant construction, reduced oil recovery activity and negative economic conditions in the heavy equipment and construction industries generally. FMC went out of the heavy lift crane market in 1984.

#### (5) Prior Art and Statutory Bar Evidence

In support of its contention that the '383 patent is obvious based on prior art, FMC relies on the following references:

(A) German patent 1,185,353 published January 14, 1965 and issued to Hans Scheuerpflug on September 9, 1965. (PX 13)

(B) An article written in German by Hans Scheuerpflug entitled "Disconnectable and Extendebile Truck-Mounted and Mobile Slewing Cranes" published in *fordern and heben* and distributed at the 1964 Munich Fair. (PX 178A)

(C) Beduhn's written proposal Q–1064 entitled "Big Ring Adapter 4000 W Vicon," which FMC claims is a printed publication describing the '383 invention more than one year before the date of filing the patent application. (PX 6 and 6A–D)

(D) The text of a speech by Beduhn entitled "Extraordinary Crane Applications," presented at the 1966 Annual Convention Heavy Specialized Carriers Conference and Crane and Rigging Operators, May 3–5, 1966, and subsequently distributed to Manitowoc dealers and representatives. (PX 130) FMC claims that the speech is a printed publication describing the invention more than one year prior to the filing of the patent application.[3]

FMC also contends that the invention described in the '383 patent was on sale for more than one year prior to the filing of the patent application. FMC points to descriptions of the Manitowoc Big Ring Adapter described in proposal Q–1064 furnished to American Bridge, to Stanley Butterworth & Co., Ltd., and other United Kingdom firms, to Neil F. Lampson, Inc., to Boehck Equipment Sales, Inc., to Ebasco, to Union Carbide, to Manitou Equipment Company and to American Pipe & Construction Co.

The prior art status of the items identified as the 1965 German '353 patent and the 1964 Scheuerpflug article is not contested by Manitowoc. Manitowoc does contest the prior art status of the Q–1064 proposal and the text and illustrations of the Beduhn speech given in May, 1966. Manitowoc contends that the Q–1064 and Beduhn speech were not printed, were not publications, and were not enabling. Manitowoc contends that the invention was not reduced to practice because the unit was not manufactured and developmental tests

---

**3.** FMC contends that the Beduhn speech and sketch apply only to claims 8 and 17 and to the statutory bar defense. The remaining claims are not affected by the validity or infringement issues but are said to be affected by the issue of inequitable conduct.

were not conducted until after February 9, 1967.

### (6) The German '353 Patent

The teachings of the German '353 patent issued on September 9, 1965 were the subject of testimony by the parties' experts. A mobile truck crane is disclosed having two outrigger tables attached to the crane lower works and supported directly to ground through support plates. A boom and mast have their lower ends commonly supported on a carrier member, which appears to ride on rollers. The opposite end of the carrier, in turn, is connected to the upper rotating portion of the main lift crane so that the boom and mast may revolve about a ring as the upper portion of the lift crane rotates about the lower portion of the crane. An extra counterweight is disclosed. However, its mounting is unlike that found in the '383 patent. The extra counterweight appears to be present to stabilize the lower works of the truck crane. There is no basis to compare it to the lift-off loading found in the '383 patent.

With respect to claims 5 and 6 of the Manitowoc patent, the German '353 patent does not provide means interconnecting the counterweight and the boom for raising the counterweight off of a support when the boom is loaded by hoisting a load (Figure 3). The German patent does not provide for lift-off of the auxiliary counterweight at some level of loading. Claim 5 of the '383 patent provides means (Figure 4) cooperating between the counterweight and the upper works to enable the counterweight to rotate with the upper works. The German patent does not disclose this feature.

### (7) The Article by Scheuerpflug

The 1964 article written in German by Scheuerpflug describes and shows (in Figure 14) an extended truck-mounted crane for lifting capacity of 30,000 pounds at a radius of 11.6 meters similar to the German '353 patent. A mobile truck crane is disclosed that has a rotating upper portion and a lower stationary portion apparently within an auxiliary support which transmits loads directly to ground. A lifting boom and mast have their lower ends commonly supported to travel about the upper surface of an auxiliary ring and are operably connected to the upper portion of the crane by an intermediate carrier member. The figure in the article and the text show disclosures similar to those found in the German patent '353. A gantry found in the '383 patent designed to accommodate lift-off of an auxiliary counterweight is not disclosed. There is no basis to conclude that the support system is as shown and connected in Figures 2 and 5 of the '383 patent. Means for horizontal and vertical travel and movement of the auxiliary counterweight is not disclosed.

Neither of the parties' experts were able to clearly identify the rigging shown in the article or to explain exactly how it operates with respect to the counterweight. The translation of part of the German article by Scheuerpflug states:

> "To avoid overloading the retraction mechanism under load, two ropes are arranged at the counterpoise carriage, with two levers on top at the standard retraction block and tackle system."

This purpose is unrelated to the use or operation of the auxiliary counterweight as disclosed in the '383 patent. There is no basis to conclude that the crane in the article employs a lift-off sequence of loading.

Neither the German '353 patent, nor the article appear to be pertinent to the disclosures of the '383 patent.

### (8) The Q–1064 Proposal

The Q–1064 proposal describes a heavy lift attachment and includes sketches which are substantially different from the Figures in the '383 patent. The text of the proposal is as follows:

"BIG–RING ADAPTER" 4000W VICON

Submitted June 22, 1966
Dan Beduhn
Contract Products Mgr.

*Note:*

The information given in this proposal is considered preliminary and subject to confirmation by factory tests.

## PREFACE

This proposal describes a means of using a 36′ diameter roller path as an attachment to a standard crawler crane.

The attachment is such that it can be simply assembled in the field where lifts exceeding the capability of the largest crawler machines are encountered.

Although the arrangement allows greatly increased capacities at long radii, the basic machinery is standard providing excellent parts and service availability.

The "BIG RING" concept as described herein is for use with a MANITOWOC 4000W crawler crane. Although the attachment being built was selected for this model the idea is not limited to this size machine.

The proven dependability of the basic machine plus the added versatility and capacity of the concept points again to MANITOWOC for MORE PROFITABLE PRODUCTION.

## COMPONENT DESCRIPTION

1. *Side Beams:* Two fabricated side beams designed for simple sturdy attachment by bolting to the carbody wings with crawlers retracted. The beams have brackets near each end for pin connecting four hydraulic leveling jacks and machined pads at each end to support one or more of the four "BIG–RING" segments.

2. *Hydraulic Jacks:* Four jacks capable of raising and leveling the complete system.

2a. *Pump & Controls:* (Not shown) Complete pump, piping and control system for operating hydraulic jacks. This system is designed for installation within the machinery house.

3. *"BIG RING":* A 36 foot diameter ring fabricated in 4 segments. Front and rear segments are identical and side segments also are identical. The segmented construction allows for shipping by truck and in many instances only the front segment will be required for limited swing (30° max.).

4. *Rotating Bed Extention:* A fabricated extention designed for pin connection to the standard rotating bed. This unit carries the auxiliary house rollers, hook shoes and pivot brackets for the mast and boom.

5. *39′ Mast:*

6. *Boom:* A variety of standard boom arrangements are available for special lift requirements. See accompanying charts for maximum capacities with each arrangement.

7. *Added CWT:* A 50,000 lb. counterweight to attain maximum capacity from the system. Under conditions of no load this counterweight rides on rollers engaging the 36′ diameter path. Under lifting conditions this counterweight will lift from the path slightly and swing with the upper.

Also attached to the proposal are charts setting forth lift capacities with contain boom lengths and radii. These charts were determined by calculation. The illustration that was a part of Q–1064 is attached hereto as Appendix No. 2.

A comparison of Q–1064 with the details of the '383 patent indicates that Q–1064 is no more than a statement of a concept which had not been reduced to practice by design, manufacture of a unit or developmental testing. Moreover, the concept as stated does not reveal sequential loading or the means for simultaneous horizontal travel and vertical movement of the auxiliary counterweight.

The illustration in Q–1064 of a crane operating with the auxiliary counterweight would not provide lift-off of the auxiliary counterweight. The connection between the counterweight and the mast appears to be by wire rope. Wire rope would not be suitable and is not used as an element of the Beduhn invention. The counterweight strap (128 in the '383 patent) is a piece of solid metal that was not designed until

after the issuance of Q–1064. Also, the actual link system (86, 82, 84 in the '383 patent) is substantially different from the sketch shown in Q–1064.

The Q–1064 brochure does not sufficiently disclose the subject matter of the '383 patent claims so that one skilled in the art having access to Q–1064 prior to February 9, 1967, would have been able to understand and practice the invention.

FMC's expert stated that it would have taken him three years to build the devices shown in the Q–1064 proposal.

FMC contends that Manitowoc disseminated the Q–1064 brochure to a number of individuals and organizations specifically knowledgeable in, and concerned with, crane equipment prior to February 9, 1967, the one-year critical date for the '383 patent application under 35 U.S.C. § 102(b). However, inasmuch as the distribution of the proposal was for the purpose of inquiring whether dealers or prospective customers (as distinguished from persons skilled in the art of crane design) would be interested in a heavy lift attachment based on the concept described, and because the document does not "describe" the '383 patent invention, it is not necessary to determine whether or not Q–1064 was either "printed" or a "publication" within the meaning of 35 U.S.C. § 102(b).

### (9) The Beduhn Speech

Beduhn's May, 1966 Las Vegas speech was mailed to Manitowoc's marketing organization. The drawing attached to the Beduhn speech (apparently given with a slide presentation which is not in evidence) does not disclose the invention found in the '383 patent. The Q–1017 proposal attached to the speech discloses even less data than that found in the Q–1064 sketch. The speech and the attachments do not in any substantial way describe the invention in suit. The Beduhn speech was not an enabling disclosure that would permit one of ordinary skill in crane design to produce the invention. Accordingly, it is not necessary to determine whether the speech was "printed" or a "publication" within the meaning of 35 U.S.C. § 102(b).

### (10) Building, Testing and Sale of the Ringer

FMC contends that the Manitowoc crane and lift attachment design described in Q–1064 was offered for sale to the American Bridge Division of U.S. Steel, Stanley Butterworth & Co., Ltd. (through A. Long & Co., Ltd), George Wimpey & Co., the Powergas Corporation, Ltd., ICI, Purchas, Ltd., Neil F. Lampson, Inc., Boehck Equipment Sales, Inc., Ebasco, Union Carbide, Manitou Equipment Company and American Pipe & Construction Co. The focus of the dispute is whether or not Manitowoc's pre-February 9, 1967 promotional efforts constitute an offer for sale under the patent law. This in turn raises the factual issue of whether the '383 invention had, prior to February 9, 1967, been sufficiently completed or known to be ultimately buildable and workable so as to render the invention capable of being offered for sale in the sense that it was "on sale in this country, more than one year prior to the date of the application" for the '383 patent. Much evidence was devoted to this issue.

An assembly drawing for a 36 foot roller path (Dwg. No. 50470) is dated September 15, 1966. Revisions to this assembly drawing were made in June, July and August 1967. A drawing for the front and rear ring segments (Dwg. No. 43803) is dated October 5, 1966. A blueprint of the end segment drawing bears a Manitowoc machine shop date stamp of November 16, 1966. This blueprint also shows that revisions were made on November 11, 1966. Assembly drawings for the front roller carrier (Dwg. No. 50457) were made and dated September 26, 1966 and November 1, 1966. Revisions to the drawing were made on February 8, 1967 and March 21, 1967, after partial ring testing. The folding gantry assembly drawing for the 36 foot roller ring (Dwg. No. 43761) is dated October 7, 1966. This drawing was redrawn on March 24, 1967, after the partial ring tests were conducted on the Model 4000W crane Ser. No. 40141 (which was shipped to customer Neil Lampson). The drawings for the upper and lower links (82 in the '383 patent)

are dated September 30, 1966. The drawing for the auxiliary counterweight straps (128) is dated September 6, 1966. The effective length of these straps was changed during the partial Ringer tests, and the drawing was revised in June 1967.

The first partial Ringer—front and rear ring segments—was assembled and tested at Manitowoc in March 1967. Deflection of the partial ring was measured and strain gauge readings were taken on the front ring segment and the front roller carrier. Before these strain gauge tests, the deflection, stability under heavy loads, and the ability of the front roller carrier and gantry assembly to transmit both the lifted load and the auxiliary counterweight load without imposing these forces on the turntable bearing of the standard 4000W crane was not finally determined.

Today, crane design is heavily supported by computer analysis which requires less reliance on test data. That was not the case in the 1960's.

During the March 1967 tests, the design and effective length of the auxiliary counterweight straps was modified to ensure that the auxiliary counterweight was supported when loads were not being lifted by the boom and to cause the auxiliary counterweight to lift when substantial loads were lifted. Under no load, the auxiliary weight is supported on the rear segment of the ring and under substantial load the weight and force of the auxiliary counterweight is transferred through the rigging and mast to the other side (front segment) of the ring. Drawing No. 77884 (DX 928) was revised in June 1967.

Manitowoc proceeded with the design, fabrication, assembly and testing of a complete Ringer attachment during April through August 1967. The side segments design of the ring (drawing No. 43802) was received in the Machine Shop on March 29, 1967. The first full Ringer was tested with 80' of No. 7 boom in May 1967. Loads of 200T and 300T were lifted. Deflections in

the full ring were measured. Strain gauge measurements were taken of the ring assembly, the front roller carrier, the hook roller hanger, the folding gantry, the boom butt and top, the mast, and the boom hoist bridle links. In June and July, 1967, the Ringer was tested with a 270' boom. Additional strain gauge testing was conducted of the load bearing and force transmitting components. During August 1967, the full Ringer was tested with 80' No. 7 boom at maximum lift capacities of 300T. Further tests were also made to determine the deflections in the ring segments due to post or pedestal supports being uniformly spaced around the ring in place of the wood blocking used in the earlier tests.

Following the full Ringer tests in the summer of 1967, a new counterweight strap drawing was prepared to permit fitting of the strap to the auxiliary counterweight for Ringers assembled in the field.

During the period of June to August 1967, Manitowoc invited many dealers, distributors and potential customers to inspect the first "Ringer" while it was set up for testing.

Photographs were taken of the Ringer on test and the first product brochure was printed in June 1967. News releases were prepared and circulated to trade journals. Advertising "Announcing The Ringer" was published in Engineering News Record and other crane industry publications.

The first partial Ringer was assembled and tested in March 1967.[4] The first full Ringer was built, and tested in May 1967 with testing continuing through August 1967. The first shipments of the initial six Ringer attachments occurred in September, October, and November 1967.

The first Ringer attachment and crane sold to Butterworth in late 1967 cost approximately $330,000. Butterworth sought to obtain a license to import units into the United Kingdom without paying an import tax. He applied for and sought an import

---

**4.** This finding is in accord with the finding of the court in *American Hoist.* 448 F.Supp. at 1375.

license during 1966. He did not commit himself to a purchase order until receiving favorable action on his license application and inspecting tests of a unit in the summer of 1967.

The cranes with a Ringer attachment sold by Manitowoc and the Heavy Lift attachments sold by FMC varied in price between $330,000 and $1.4 million. It is not surprising that customer orders were sought before units were constructed. The cost of such units and the manufacturing effort does not compare with the production of low-cost consumer products manufactured on a mass scale.

The Ringer was not "on sale" before February 9, 1967. Contacts with potential customers about configurations to increase the capacity of a crane were subject to development, testing and reduction to practice. The prototype Ringer was not assembled and tested until after February 9, 1967. It was not until after development tests that potential customers were invited to witness demonstrations. Testing after the critical date produced several significant changes in the Ringer design. Accordingly, the actual invention was not "on sale" before February 9, 1967.

### (11) Ordinary Skill in the Art of Crane Design

The inventor, Daniel Beduhn, was born in 1921. He was a high school graduate who spent one year at the University of Wisconsin studying engineering. He was employed by Manitowoc in 1941 as a machinist apprentice. He moved to the engineering department as a draftsman and designer. After promotions he was director of contract products and technical services for Manitowoc. Beduhn obtained other patents in addition to the '383 patent.

A person skilled in the relevant art of crane design would be a graduate mechanical or civil engineer with several years experience in crane design or have technical education in stress and strength mechanics and a longer period of experience in crane design.

A salesman, distributor or crane customer would not be a person of ordinary skill in the art of crane design.

### (12) Obviousness Based on Prior Art

It would not have been obvious to one having ordinary skill in crane design and lift attachment prior art to design a circular support and carrier about a lift crane to advance the fulcrum of a crane; to elevate that crane with a hydraulic jack system; to place an auxiliary counterweight at the rear of the crane to ride on the circular support; to provide connection means to lift the auxiliary counterweight off of the support ring under load conditions; to provide a guide system for horizontal travel of the auxiliary counterweight that permits simultaneous vertical movement; and to accomplish this invention without a major modification of a crane. It is only with hindsight and the disclosures of the '383 patent at hand that the alleged prior art can be described as foreshadowing this invention which multiplies from two to four times the lifting capacity of standard cranes.

### (13) Considerations of Commercial Success and Customer Needs

The '383 patent was clearly a significant advance in the art of lifting heavy objects. It was also a very significant commercial success and met the demand and needs for greater heavy lifting capability with the use of existing cranes.

FMC freely admits that but for the '383 patent it would have copied the Manitowoc Ringer. Its damage claim and calculations are based on this assumption.

### (14) Claim, Specificity and Mode Requirements

A patentable invention must be disclosed in a manner sufficient to enable a person of ordinary skill in the art to practice the invention. The manner and process for practicing the invention must be fully and accurately set forth in the patent document itself, and that which the inventor regards as his invention must be claimed with precision and specificity. These standards—enablement, best mode and claim specificity—

are statutory requirements established by 35 U.S.C. § 112. A failure to satisfy any one is grounds for invalidity.

Based on the specifications, drawings and claims 5 and 6, it clearly appears that the patent fairly and fully meets these standards. In fact, the patent goes beyond statutory requirements and provides considerable design detail.

FMC argues that the disclosure of the gantry system (Figure 1, 76) and the counterweight strap design (128) was inadequate to reveal the nature of lift-off because the exact size of the linkage holes was not disclosed. This argument focuses improper attention on the size of the linkage holes (86, 82, 84). Practice of the invention does not require precise size linkage holes—only that linkage holes be utilized and that the counterweight strap be of solid material rather than wire rope. All of this is fully disclosed in the patent drawings and specifications. Rotation of the mast in a clockwise direction on lift-off is indicated in Figure 3. The deflection in the gantry system which is a part of this process is fully explained.

To require further detail to satisfy requirements of enablement, best mode, or claim specificity is not necessary and would impose unreasonable standards contrary to the best interests of the patent system.

### (15) Infringement by FMC

The accused FMC LS–718HL crane and lift attachment combination illustrated below includes an auxiliary counterweight, which is supported by an auxiliary frame, which, in turn, travels on a circular ring. The accused LS–918 HL crane is similar in design to the LS–718 HL although much larger. Attached hereto as Appendix No. 3 is a drawing showing this unit.

When the FMC LS–718HL crane is operated within its normal load ranges, the main crane body does not act as a counterweight. Rather, the main crane body simply functions to rotate the auxiliary frame about the circular ring. Also, the auxiliary counterweight and auxiliary frame on which it rests does not lift off of the ring. They are not designed to do so. Such an operation would exceed the rated capacity of the crane, and would be unsafe. (The same finding is applicable to the LS–918HL crane, which, like the LS–718HL, has a counterweight that does not lift-off the ring during normal operations.)

The rated lift capacity of a crane must be published by the crane manufacturer. The operation of a crane beyond such rated capacities is a violation of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 et seq., an unlawful act which subjects a crane user to serious civil and criminal penalties.

The FMC capacity charts contain the following statement:

Capacities included in this chart are the maximum allowable, and are based on machine and heavy lift attachment roller path standing level on firm supporting surface under ideal job conditions.

The practice of the '383 patented invention requires that the auxiliary counterweight lift off its support ring during the normal operation. Lift-off (infringement) can only occur if the FMC cranes are operated at a 100% tipping capacity. The auxiliary counterweight in the FMC cranes will not lift off the ring when the cranes are being operated within their legal operating limits. Thus, there can be no practice of the Beduhn invention or infringement of the Manitowoc patent. FMC has rated its accused cranes at the legal 85 percent limit in accordance with OSHA requirements. Those rated capacities are published and are placed in the cabs of the accused cranes. Crane operation within those limits will not result in lifting of the auxiliary counterweight, which is a prerequisite to Manitowoc's patent infringement claim.

Manitowoc has not proved the tort of patent infringement by FMC through the introduction of evidence that owners and users of cranes customarily violate the law. Manitowoc has not offered any convincing evidence that owners and users of the type of heavy lift equipment in question customarily violate the law.

FMC is a crane manufacturer, not a crane user. FMC's infringement, therefore is dependent upon the use to which its cranes may reasonably be put. There is no sound basis for this court to conclude that the FMC cranes would be operated in violation of the law or would be deliberately or accidentally overloaded. The evidence shows that the accused cranes and their payloads are enormously expensive and that, if anything, persons operating such equipment would be expected to be careful.

In addition to the absence of counterweight lift-off structure generally, FMC has eliminated from its design various other essential elements of the Manitowoc claims. The counterweight from the main body of the FMC crane is actually shifted to the frame supporting the auxiliary counterweight. The FMC cranes do not have a "carrier" for the mast and boom which is connected to the main body of the crane. They do not have a counterweight that is "directly supported" on a ring. The FMC cranes do not have a pivoting mast as required by many of the Manitowoc claims. Thus, even if the FMC counterweight frame did lift off the ring during operation, infringement would still not exist since essential elements of the asserted Manitowoc patent claims are absent from the accused FMC structure.

Claim 5, and dependent claim 6, were amended during the application process in the Patent office to distinguish over a prior art reference so as to specify that the counterweight be "directly supported" or "supportedly engaged" by the auxiliary or ring support. Manitowoc is accordingly estopped from interpreting those claims other than to include the counterweight directly in contact with the ring support. FMC's counterweight has no contact with its ring support and is not directly supported as required by the Manitowoc claims. FMC's counterweight is carried by an auxiliary frame which encompasses FMC's basic crane. FMC's counterweight is not "directly supported" or "supportedly engaged" by the ring support, and, therefore, no structure has been made, used or sold which infringes Claims 5 and 6.

The accused FMC cranes and heavy lift attachments did not infringe the '383 patent.

## (16) Inequitable Conduct by Manitowoc

During 1966–69, patent matters were handled by Manitowoc through a patent agent who would send information to a Washington, D.C. patent lawyer. The in-house agent, Randolph, contacted a lawyer, who came to the Manitowoc plant to see the Ringer machine and obtain the patent disclosure information. Randolph had Q–1064, but did not regard it as a printed publication nor as a complete teaching of the Ringer and had never considered "on sale" issues with respect to Q–1064. Randolph believed that testing of an invention was critical and that there could be no patent "on sale" if the machine did not yet exist. Randolph had seen Beduhn's Las Vegas speech (DX–130) some years before, but he did not regard it as a printed publication or a description of the Ringer. John West gave Randolph a M.A.N. crane brochure that was given to counsel and it was presented to the Patent Office. The Scheuerpflug U.S. '189 patent was found in a patent search. Randolph did not see the German magazine article (PX–178). Randolph and counsel did not have or discover the German '353 patent (PX–13).

Randolph knew of the one year rules and made it a practice to tell the outside patent lawyer of known prior art. West brought only one publication back from Germany in 1964 several years before the '383 application was filed. He gave this to Randolph and a copy is referred to in the '383 application file. West did not have or furnish the German article or German '353 patent before this lawsuit.

FMC's witness Van de Hey testified that West had a great deal to do with reviewing patent applications. Van de Hey also said West brought from Germany the M.A.N. article and that West had the German '353 patent. This was denied by West. The German '353 patent was not open to public inspection until January of 1965 and was not issued until September 1965. West

does not speak German. West did not have or furnish the German article or the German '353 patent to Randolph.

There is no evidence that Beduhn thought the Q–1064 proposal or his speech was a "printed publication," or that his discussions with potential customers concerning what Manitowoc might build after testing constituted placing anything "on sale." There is no evidence of any intent to withhold any information from the Patent Office or to withhold evidence known to be material and controlling, even if the documents are regarded as pertinent prior art. The record does not support a finding of inequitable conduct on the part of the inventor or any Manitowoc representative.

### (17) Relevant Geographic and Product Markets

FMC, Manitowoc and other manufacturers of cranes and other lifting devices completed during the period relevant to this case on a worldwide basis. The percentage of United States-manufactured large crawlers/heavy lifts which were exported outside the United States was approximately 30% in 1973. The non-existence of a separate United States market is demonstrated by the closely parallel movement of crane and Ringer prices in the domestic and export markets. This parallel movement may have been caused either by demand substitutability or supply substitutability. It demonstrates that a market boundary line cannot be drawn around the United States. The prices remain parallel in spite of divergence in the amount of domestic and export sales.

In its 1977 Long Range Plan, FMC stated that United States exports comprised 20% of the market for cranes outside of North America. A substantial percentage of the world's need for cranes was supplied by non-U.S. suppliers. Using 1976 annual report statistics, FMC compared exports as a percentage of total sales of Koehring (46%), American Hoist (44%), P & H (41%), Bucyrus-Erie (40%), Manitowoc (33%), and FMC (29%). According to the FMC 1975 Long Range Plan, "export markets have always been important to construction machinery;" thirty percent of all machinery leaves the country.

The kinds of projects for which heavy lift equipment is purchased or rented include power plants, chemical and petrochemical plants, oil refineries, bridges, dams, steel mills, paper mills, port facilities, jetties, and fabrication yards for the construction of offshore oil rig platforms.

Cranes and other lifting devices have a long useful life. Manitowoc has cranes 40 or 50 years of age still in operation. There is a substantial demand for and supply of used cranes, which compete for possible purchase in the market place. Contractors, end-users and rental companies all deal in the used crane market.

Crane manufacturers making heavy-lift equipment competitive with FMC and Manitowoc include American Hoist, Demag, Liebherr, Cottwald, P & H, Koehring, Lorrain, Bucyrus-Erie, Northwest and Kobe. Amhoist, Demag, Liebherr, FMC, P & H, and Kobe produce heavy lift attachments which augment the lifting capacity of their heavy lift cranes. Those devices included the Amhoist Sky Horse, Guy Derrick, Super Sky Horse, and Ring Horse, the Demag Super-Lift and Ring-Lift and the Liebherr Maxi-Lift. The Demag attachments were usable on truck cranes and later on crawler cranes, as was a Liebherr heavy lift attachment. The foreign companies were competitors in the overseas portion of the market, prior to their entry in the U.S. market.

The decision as to which crane or other lifting device may be used in any particular application depends upon a variety of factors including the weight of the item to be lifted, the amount of space available for the lifting equipment, the height of the lift, the need to "travel" with the load, the distance the load needs to be moved, the time available for setting up the equipment, the ability to accommodate guy wires or a ring-attachment of a given size, the condition of the surface onto which the equipment is to be placed, other conditions at the site which restrict or affect the space available, the available equipment on or near the site, equipment owned by the

contractor or owner and other factors. These factors, and the individual features of each piece of lifting equipment, result in various cranes, with or without heavy lift attachments, as well as other heavy lift devices, competing with each other.

A potential user of lifting equipment will take into account numerous factors in selecting equipment for a particular lift, including availability of equipment, economic considerations, the reliability of the equipment and the manufacturer and resale value of the equipment, familiarity with the equipment, how the job was designed, and the ability of a device to perform the work.

Ring-type heavy lift attachments do not constitute a separate, commercially-meaningful market. Cranes with heavy lift attachments competing with the '383 patent include other cranes without a heavy lift attachment, cranes with other heavy lift attachments, and other lifting devices.

The prices—gross margins—of cranes sold to Ringer customers and to non-Ringer customers were compared. Ringer customers are not in an economically-meaningful separate market. Comparing the cost per pound of lift capacity of Ringer cranes and other heavy lift machines, it appears that the market values most of them at about $2 per pound. The cranes with Ringers do not command a monopoly premium and were not in a separate relevant market. Viable substitutes for crawler cranes with heavy lift attachments include gin poles, derricks, tower cranes, gantries, truck cranes, larger cranes, combinations of smaller cranes and jacking systems.

#### (18) Monopoly Power of Manitowoc

Manitowoc's cranes with heavy lift attachments did not enjoy a monopoly share of any relevant product or geographic market. Manitowoc had neither the power to control prices nor to exclude competitors in any relevant product or geographic market. Neither the Ringer attachment nor the Ringer attachment with a compatible Manitowoc crane formed a separable market. There is no evidence of an appropriate market relevant to the issue of monopoly power and no evidence that Manitowoc had a monopolistic share of any such market. FMC attributed to Manitowoc no more than 25% of what FMC considered the commercially-significant market. FMC's 1975 long-range plan, states that "this is not an industry dominated by a single giant firm." With respect to what FMC then considered the cable crawler market, the 1975 plan predicted that there will continue to be a fight for number 1 market position in 1980 between Manitowoc and American Hoist with FMC in third place.

The existence of the '383 patent did not give Manitowoc the power to control prices of cranes, heavy lift attachments or cranes with heavy lift attachments manufactured and sold by others. Manitowoc followed a virtually identical procedure for pricing its Ringer attachment, with respect to which FMC has alleged a monopoly, as it followed for pricing its other machines. The prices as represented by gross margins of compatible cranes sold to Ringer customers, in the allegedly controlled market, are substantially the same as the prices to non-Ringer customers. There was no monopoly in sales to Ringer customers.

FMC's long-range planning documents projected larger growth by AmHoist than by Manitowoc in the cable crawler market. AmHoist, like FMC, was precluded from copying the Ringer but, according to FMC's contemporaneous documents, was not excluded from the commercial markets then recognized by FMC.

### III.

### CONCLUSIONS OF LAW

#### (1) Validity

A patent is presumed to be valid. 35 U.S.C. § 282. This presumption can only be overcome by clear and convincing evidence. *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1443–44 (Fed.Cir.), *cert. dismissed,* 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984). The party asserting invalidity has the burden of proof. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983).

■ Patentability depends on utility and novelty as defined in 35 U.S.C. §§ 101 and 102, and nonobviousness as set forth in 35 U.S.C. § 103. *Graham v. John Deere Co.,* 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545 (1966). Utility is not in issue in this case. A determination that novelty does not exist requires that each element of the claim under consideration be disclosed in a single prior art reference. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). No such contention is made in this case. A determination of obviousness under 35 U.S.C. § 103 requires extensive analysis of the prior art.

■ A court is required to place itself in the minds of those of ordinary skill in the art at the time the invention was made in order to determine whether the claimed invention would have been obvious at an earlier time. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138 (Fed.Cir. 1985). The invention must be viewed in the context of the art that existed at the time the invention was made and not with hindsight or the specifications of the inventor. The Court of Appeals for the Federal Circuit has recognized that:

This is not a facile statutory interpretation. The quality of non-obviousness is not easy to measure, particularly when challenged years after the invention was made.

774 F.2d at 1138.

■ The failure of others to "see" the invention, the commercial success of the invention and the desire to copy all point to nonobviousness.

Obviousness is a conclusion of law based upon fact determinations. As set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, [86 S.Ct. 684, 693, 15 L.Ed.2d 545] 148 U.S.P.Q. 459, 467 (1966), and in *Stevenson v. U.S. International Trade Commission,* ... 612 F.2d 546, 549, 204 U.S.P.Q. 276, 279 (C.C.P.A.1979), those fact determinations involve (1) the scope and content of the prior art, (2) the differences between the prior art and the

claimed invention, (3) the level of ordinary skill in the prior art, and (4) additional evidence, which may service as indicia of nonobviousness. As is or should be true with every performance of judicial process, all relevant evidence on each dispositive issue must be fully considered and evaluated. When a patent is challenged on the ground that the claimed invention would have been obvious, all evidence relevant to the obvious-nonobvious issue must be considered.

*Environmental Designs Ltd. v. Union Oil Co.,* 713 F.2d 693, 695 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

With respect to the level of ordinary skill:

The important consideration lies in the need to adhere to the statute, *i.e.,* to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of "ordinary skill in the art"—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.

*Environmental Designs Ltd. v. Union Oil Co.,* 713 F.2d 693, 697 (Fed.Cir.1983); *see also Stewart-Warner Corp. v. City of Pontiac, Michigan,* 767 F.2d 1563, 1570 (Fed. Cir.1985).

■ Based on the findings previously stated, the prior art—the Scheuerpflug '353 German patent and article—does not make the invention shown in the '383 patent obvious. Essential elements of the patent were not disclosed. It is only with hindsight that this material can even be argued to be prior art. The Beduhn Q proposals and speech are not prior art because no more than non-enabling concepts are shown that are incomplete in material elements. For the same reason they are not printed publications disclosing the invention.

FMC has not proved, by clear and convincing evidence, based on prior art, that the subject matter as a whole claimed in the '383 patent would have been obvious at the time the invention was made to a person having ordinary skill in the art or that

it had been disclosed in a printed publication.

### (2) Sale of the First Ringers

Statutory bar provisions of the patent statute require that patent applications be filed within one year of placing the invention "on sale" in this country. 35 U.S.C. § 102.

■ To be "on sale," the complete invention must have been embodied in the thing offered for sale. *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1580 (Fed.Cir.), *cert. denied*, ─ U.S. ─, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836–37 (Fed.Cir.1984). The invention must also have been tested sufficiently to verify that it is operable for its intended purpose. *General Electric Co. v. United States*, 654 F.2d 55, 60 n. 8, 228 Ct.Cl. 192 (1981). The invention must be complete "at least to such an extent that the purchaser knows how it will perform." *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 622–23 (Fed.Cir.), *cert. dismissed*, ─ U.S. ─, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985), *citing In re Dybel*, 524 F.2d 1393, 1400 (C.C.P.A.1975).

The first Manitowoc Ringer device was manufactured and tested after February 9, 1967. Essential changes were made after the critical date to enable the device to perform. The machine was first shown to potential customers, the first sales contracts were signed and first shipments were made after February 9, 1967.

The two machines sold to Butterworth in September and October of 1967 were among the first Ringers sold. An accident occurred and the entire Butterworth-Manitowoc file was set aside and preserved. This file establishes that the sales were conditioned on the customer inspecting a test of the new machine. There was no Ringer until it was built and tested, and there was no sale until the customer saw that the machine would work.

■ FMC has failed to prove, by clear and convincing evidence, that the invention of the '383 patent was "on sale" in this country more than one year prior to the filing date of the '383 patent application.

### (3) Claim, Specificity and Mode Requirements

■ The specificity, claim and enabling mode requirements of 35 U.S.C. § 112 are satisfied when the application contains sufficient disclosure to enable any person skilled in the art to understand the claims and to make the claimed invention. A determination is made by considering the specification, drawings and other evidence in the case in light of the knowledge possessed by those skilled in the art. *State Industries, Inc. v. A.O. Smith Corp.*, 221 U.S.P.Q. 958, 975 (M.D.Tenn.1983) [Available on WESTLAW, DCTU database], *modified on other grounds*, 751 F.2d 1226 (Fed.Cir.1985). Section 112 does not require description in terms of exact measurements, *U.S. Phillips Corp. v. National Micronetics, Inc.*, 410 F.Supp. 449, 455 (S.D.N.Y.1976), *aff'd*, 550 F.2d 716 (2d Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); *In re Marosi*, 710 F.2d 799, 802–03 (Fed.Cir.1983). Patent claims may be construed in light of the more detailed description contained in the specification and drawings. *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed.Cir.1983).

■ Based on the findings heretofore made the '383 patent easily meets the statutory requirements.

### (4) Estoppel

FMC argues that the ruling in *American Hoist & Derrick Co. v. Manitowoc Co.*, 448 F.Supp. 1372 (E.D.Wisc.1978), *aff'd*, 603 F.2d 629 (7th Cir.1979), must be given preclusive effect so as to prevent Manitowoc from arguing that the '383 patent claims or refers to 1–2 lifting action.

The AmHoist Sky Horse machine was accused of infringing claim 1 of the '383 patent. That machine had no ring but rath-

er a rubber-tired auxiliary counterweight trailer. In operation, the machine first picks up the trailer so that it is said to hang on the rear of the crane, and then the load is lifted. Manitowoc contended that first lifting the Sky Horse trailer and then operating the crane was like the operation of the '383 patent auxiliary counterweight. The Sky Horse was said to have lifting action and the court found that the Ringer actually operates with lifting action. (448 F.Supp. at 1380.)

However, claim 1 defines a "support" for the counterweight and the *American Hoist* court found that the "support" could not properly be the ground, as in the operation of the Sky Horse, but had to be something like the ring of the '383 patent. 448 F.Supp. at 1385–86. That issue is not presented in this case.

■■■ For an interpretation of a claim to be given preclusive effect in subsequent litigation, the interpretation must have been the reason for the holding of non-infringement in the prior action. *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1577 (Fed.Cir.1984). Here that is not the case. Manitowoc relies on the statement in *American Hoist* that non-infringement of claim 1 is "buttressed by the fact that claim 1 does not refer to or describe any such 1–2 lifting action." 448 F.Supp. at 1386. That statement is clearly dictum. Claim 1 had already been held to be not infringed for a different reason. This observation was not essential to the determination of infringement. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). Furthermore, this court is not construing claim 1. Claims 5 and 6 are separate claims with wording similar to but not exactly the same as claim 1. The findings and holdings in this case and in *American Hoist* are not in conflict.

### (5) Infringement by FMC

■■■ The claims of a patent provide the definition of the invention. *Autogiro Co. of America v. United States*, 384 F.2d 391, 395, 181 Ct.Cl. 55 (1967). In construing claims, not only must the literal meaning be considered, but also the prior art and the prosecution history. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 673 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

■■■ Infringement is to be decided with respect to each asserted claim. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1559 (Fed.Cir.1983). A finding of infringement depends on whether the accused device falls within the scope of the asserted claims as properly interpreted. The patented invention must first be defined, which is a question of law, and then it must be determined whether the claims cover the accused device. This latter determination is a question of fact. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984).

Based on the findings of fact previously stated the court concludes that the FMC accused heavy lift apparatus does not infringe the '383 patent.

### (6) Enforceability—Inequitable Conduct

■■■ A step by step analysis and weighing is required to determine whether an applicant has procured a patent by such conduct as will render the patent unenforceable and give rise to a determination of what has been called "fraud in the Patent Office," but what is now known as "inequitable conduct." *See J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The determination is based on the non-disclosure of pertinent prior art or statutory bar data during the prosecution process and requires clear, convincing proof. *Driscoll v. Cebalo*, 731 F.2d 878, 884–85 (Fed. Cir.1984).

■■■ A determination of "inequitable conduct" may not be based on inferences. *Nashua Corp. v. RCA Corp.*, 307 F.Supp. 152, 158 (D.N.H.1969), *aff'd*, 431 F.2d 220 (1st Cir.1970); *Citibank, N.A. v. Citibanc Group, Inc.*, 215 U.S.P.Q. 884, 902 (N.D.

Ala.1982), *aff'd*, 724 F.2d 1540 (11th Cir. 1984).

To support a legal conclusion of "inequitable conduct" there must first be proof that the non-disclosed information has a threshold degree of materiality. *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1577–78 (Fed.Cir. 1984). Second, there must be proof of a threshold intent on the part of the applicant. The evidence must indicate either "gross negligence" or an intent to deceive. *J.P. Stevens v. Lex Tex*, 747 F.2d at 1560. The levels of materiality and intent must then be balanced to determine whether "inequitable conduct" has occurred. *Id.*

Materiality and intent are interrelated, such that a lesser showing of materiality may suffice when a higher degree of intent is established, and vice versa. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), *citing Digital Equipment Corp. v. Diamond*, 653 F.2d 701, 716 (1st Cir.1981).

Materiality of the information may be proven by any of four criteria. However, the Patent Office standard (37 C.F.R. § 1.56(a)—whether there is a substantial likelihood that a reasonable Examiner would have considered the omitted or false information important in deciding whether to allow the application to issue as a patent) is the appropriate starting point. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363 (Fed.Cir. 1984). The other and more stringent standards of proof of inequitable conduct are an objective "but for" test, a subjective "but for" test (which would require testimony from the patent examiner), and a "but it might have" test. 725 F.2d at 1362–63, n. 4.

If a sufficient level of materiality is found, the intent of the applicant must be determined. Hindsight analysis should be avoided. The court must look to the facts and circumstances at the time of the patent prosecution. *See Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1152 (Fed.Cir. 1983). Simple negligence, oversight or er-

roneous judgment made in good faith are insufficient to result in a holding of "inequitable conduct." *J.P. Stevens v. Lex Tex*, 747 F.2d at 1560; *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383 (Fed.Cir.1983).

Manitowoc was not aware of the German '353 patent or the German article by Scheuerpflug. The Q–1064 work of Beduhn and the speech by Beduhn were not sufficiently enabling to constitute "on sale" or prior "printed publication" evidence. It cannot be found that the same data was sufficiently pertinent to be regarded by the inventor, his agent or attorneys as material, given its preliminary and non-enabling character. There is no basis for findings of "materiality," "gross negligence," or "intent to deceive" which would support a conclusion of inequitable conduct.

FMC has failed to demonstrate, by clear and convincing evidence, that Manitowoc engaged in "inequitable conduct" in the prosecution of the application for the Beduhn '383 patent.

### (7) Antitrust Liability

FMC has failed to prove a claim under § 1 of the Sherman Act. It has not proved joint action by Manitowoc and others for the purpose and with the effect of unreasonably restraining trade. *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 32 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). Unilateral action by Manitowoc is not actionable under § 1, and for purposes of this section, officers, employees, agents and subsidiaries are considered part of the corporation itself. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Contractor Utility Sales v. Certain-Teed Products*, 638 F.2d 1061 (7th Cir.1981). Contacts with persons outside of Manitowoc are not sufficient to create a cause of action under § 1 since there was no proof that these other persons or entities were acting together with Manitowoc to achieve an unlawful purpose.

*Monsanto Co. v. Spray Rite-Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

### (8) Walker Process

The enforcement of a patent procured by fraud may violate 15 U.S.C. § 2 provided the other elements necessary to a § 2 case are present. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

A claim under *Walker Process* and 15 U.S.C. § 2 must be established by clear and convincing evidence. *Litton Indus. Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 166 (Fed.Cir.1985); *Oetiker v. Jurid Werke GMBH*, 671 F.2d 596, 600 (D.C.Cir.1982); *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983); *American Original Corp. v. Jenkins Food Corp.*, 696 F.2d 1053, 1060 (4th Cir.1982).

■ Fraudulent procurement of a patent in the context of a *Walker Process* claim is to be distinguished from "inequitable conduct" before the Patent Office. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1560 n. 7 (Fed.Cir. 1984). To prove fraudulent procurement as defined in *Walker Process,* a claimant must establish (a) the materiality of the misrepresentation or omission and (b) an intent to defraud. *Litton Indus.*, 755 F.2d at 166; *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 450 F.2d 769, 771–73 (9th Cir.1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972).

■ The level of materiality which must be established under *Walker Process* is higher than that necessary to establish "inequitable conduct" before the Patent Office. Materiality must be established by showing that the patent would not have issued "but for" the misrepresentation or omission. *Litton Indus.*, 755 F.2d at 166; *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *Cataphote Corp.*, 450 F.2d at 773; *U.S. Movidyn Corp. v. Hercu-*

*les Inc.*, 388 F.Supp. 1146, 1155 (D.Minn. 1975).

■ FMC's failure to prove inequitable conduct results in failure to prove a *Walker Process* claim.

### (9) Monopolization

■ FMC has failed to establish that Manitowoc has monopolized a relevant market in violation of § 2 of the Sherman Act. It has not proved: (1) the existence and scope of a commercially realistic relevant market within which Manitowoc operates; (2) that Manitowoc acquired the power to control prices and exclude competition within such a market; and (3) that Manitowoc willfully acquired and maintained such power in a relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ FMC had the burden of establishing a relevant product market and a relevant geographic market, and proving the size and scope of the market. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). A relevant product market may not be defined so as to exclude alternative products that are reasonably interchangeable.

■ The constituent products within the relevant market are all those which are generally usable for the same purpose, considering their price, characteristics and adaptability. *E.I. duPont*, 351 U.S. at 395, 76 S.Ct. at 1007. FMC's proffered definition—"the market for heavy lift cranes that employ or are compatible with a ring and lift attachment of the type asserted to be within the scope of its '383 patent" fails to take into account substitutability of other products.

■ To constitute a relevant market, a patented product must dominate a real market and be able to drive all or most substitutes from the market. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261,

265 (7th Cir.1984), *cert denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). Heavy lift cranes that employ or are compatible with a ring and lift attachment of the type asserted by Manitowoc to be within the scope of the '383 patent do not constitute a relevant market because such cranes compete with some other product or products in each use or application. The superiority of a product such as Manitowoc's Ringer-equipped cranes over other products does not make it a market or submarket of its own. The suitability of the Ringer-equipped Manitowoc crane, for a few unique applications does not set it apart in a distinct market or submarket from products used for the majority of applications that arise in the marketplace. *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

The relevant geographic market is worldwide. Customers can turn to the output of various domestic and foreign manufacturers to obtain products within the relevant product market. Foreign producers directly compete in the United States, and domestic manufacturers derive income from foreign distribution. Foreign crane manufacturer's were, at a minimum, potential competitors who could enter the market to restrain any attempt by Manitowoc to meaningfully increase price and exclude competition. *See Ball Memorial Hospital v. Mutual Hospital Insurance*, 784 F.2d 1325, 1335–37 (7th Cir.1986).

Manitowoc did not possess monopoly power in the relevant market. It did not have the ability to control prices and exclude competition. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Manitowoc did not possess a dominant share of the relevant market. *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945); *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 33 (7th Cir.1976).

FMC has failed to establish that Manitowoc possessed monopoly power in light of the size of Manitowoc's 25 to 30 percent share of the relevant market when considered together with the existence of potential entrants into the market.

The only predatory conduct FMC has alleged is Manitowoc's acquisition and attempted enforcement of its '383 patent. It has failed to demonstrate that this conduct resulted in monopoly power, it is likewise unable to demonstrate that there was a dangerous probability of monopolization.

**(10) Unfair Competition and Damages**

Having found and concluded that Manitowoc is not liable to FMC on any federal theory, it is unnecessary to discuss an asserted state law claim of unfair competition which depends on rejected findings of patent invalidity and inequitable conduct. Accordingly, it is also unnecessary to consider FMC's proofs of damages.

IT IS THEREFORE ORDERED as follows:

(1) The court resolves the contested issues of fact and law on the issue of the validity of the Manitowoc patent 3,485,353 in favor of Manitowoc and against FMC on the merits and declares that the now expired patent was valid.

(2) The court resolves the contested issues of fact and law on the issue of infringement of the Manitowoc Patent 3,485,-353 in favor of FMC and against Manitowoc on the merits and declares the patent not to have been infringed by the accused FMC heavy lift equipment.

(3) The court resolves the remaining contested issues of fact and law in favor of Manitowoc and against FMC on the merits and dismisses FMC's claims with prejudice.

(4) Each party shall bear its own costs and legal fees.

Dec. 23, 1969

D. E. BEDUHN

3,485,383

AUXILIARY SUPPORT FOR CRANES

Filed Feb. 9, 1963

3 Sheets-Sheet 1

FIG. 5

FIG. 1

FIG. 4

INVENTOR
DANIEL E. BEDUHN

Dec. 23, 1969      D. E. BEDUHN      3,485,383

AUXILIARY SUPPORT FOR CRANES

Filed Feb. 9, 1968        3 Sheets-Sheet 2

FIG. 2

INVENTOR
DANIEL E. BEDUHN

Dec. 23, 1969     D. E. BEDUHN     3,485,383

AUXILIARY SUPPORT FOR CRANES

Filed Feb. ., 1968        5 Sheets-Sheet

FIG. 3

INVENTOR

DANIEL E BEDUHN

# APPENDIX NO. 2

BY............ DATE............    SUBJECT........................................    SHEET NO ....2....OF ...1....

CHKD. BY............DATE............    ............"BIG RING."........................    JOB NO...Q1064..............

         MODEL 4000 W VICON

SECTION "A-A"

3223

BRIDLES

STD GANTRY

4000W

JACKS OR BLOCKING

# APPENDIX NO. 3

**Nomenclature**

1. Erection jack
2. Screw jack
3. Float
4. Heavy Lift roller path
5. Auxiliary frame
6. Standard LS-718 counterweight
7. 130' (39.62 m) Heavy Lift mast lower backstay pendant equalizer
8. Retractable gantry
9. Heavy Lift counterweight
10. Mast erection reeving
11. Live mast
12. Live mast bridle
13. Mast backstay pendant guides
14. Live mast support
15. Boom foot
16. Mast foot
17. Boom stops
18. Boom base section
19. Fleeting sheave assembly
20. Mast stops
21. Mast base section
22. Main load hoist line
23. Mast erection pendants
24. Mast backstay pendants
25. Main load hoist line deflector sheave
26. Boomhoist rope deflector sheave
27. Whipline
28. Deflector rollers
29. Mast upper backstay pendant equalizer
30. Mast top section
31. Tip extension
32. Mast head shaft
33. Boomhoist ball
34. Boomhoist reeving
35. Boomhoist bridle
36. Basic boom pendants
37. Boom pendant links
38. Boom head machinery
39. Boom head section
40. Boom top section
41. Jib backstay pendants
42. Jib backstay pendant spreader bar
43. Jib mast
44. Jib load hoist wire rope deflector sheave
45. Jib frontstay pendants
46. Jib
47. Jib head machinery
48. Boom and mast carrier
49. Auxiliary counterweight carrier frame